*217 Burke, J.
The only issue presented on this appeal which calls for a modification is the reliance of the courts below on eiToneoqs principles of law regarding the evslqatioq of the *218 condemnees’ intangible property. The theory relied upon is unrealistic, resulting- in the denial of the just compensation to which claimants are entitled under the Constitution. The present award is sufficient only as compensation for the value of the tangible property taken.
The problems raised in this condemnation proceeding are difficult and to a degree unique. In this era of spiraling inflation such proceedings will continually reoccur since it is beyond the resources of private enterprise to provide mass transportation at modest rates, dictated by political exigencies and confiscatory as far as the equity in the business is concerned. However, “ It does not rest with the public, talcing the property through Congress or the Legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation.” (Monongahela Nav. Co. v. United States, 148 U. S. 312, 327 [1893]; Railway Steel Spring Co. v. Chicago & E. I. R. Co., 261 F. 690 [U. S. Dist. Ct., N. D., Ill., 1919]; Matter of City of New York, 190 N. Y. 350, 353 [1907].) However laudable the political motivation is in depriving claimants of their transportation system, they must be fully compensated’ therefor. In Matter of New York Edison Co. v. Maltbie (244 App. Div. 436, 442 [3d Dept., 1935]) the court stated: “This announcement indicates a motive to be generous toward needy rate payers with the money and property belonging to the utility companies. Some may regard this as desirable and the motive as praiseworthy, but ‘ the point is not one of motives, but of constitutional authority, for which the best of motives is not a substitute.’ (Panama Refining Co. v. Ryan, 293 U. S. 388, 420 * * *.) ”
The right to a reasonable fare is part of all franchise contracts. (People ex rel. City of New York v. Nixon, 229 N. Y. 356 [1920].) As this court stated in People ex rel. Kings County Light. Co. v. Willcox (210 N. Y. 479, 491 [1914]): “ The right to limit the corporation to a fair return fixed by public authority necessarily involves the correlative right in the corporation to be assured of that fair return during all the time that its capital is employed in the public service. ’ ’ In Matter of Queens-Nassau Tr. Lines v. Maltbie (186 Misc. 424 [Sup. Ct., Albany County, 1946], affd. 271 App. Div. 81 [3d Dept., 1946], affd. without opn. 296 N. Y. 893, 894, 896, 898, 899, 901 [1947]), the court held *219 that the Public Service Commission had jurisdiction over omnibus rates and accordingly was hound to permit claimants to charge a reasonable and compensatory fare notwithstanding any contrary provisions contained in the franchise agreements. The predecessors of claimants herein were parties to Maltbie and the franchise contracts herein were among those there in issue. Thus fare increases were granted to claimants by the Public Service Commission in 1948 and 1949. The Public Service Commission stated in Matter of Lester T. Doyle, Trustee (11 PUR 3d 491, 497-498 [N. Y. Pub. Serv. Comm., 1956]): “We do not fix the rates of this system [the Third Avenue system] as a whole. Except for the relatively minor operations in Westchester county they are fixed by the city of New York. The applicable statute imposes the same duties upon the city as upon the commission. Rates for bus companies under the Public Service Law (§ 63-b) are based upon capital actually expended. The city of New York stated on the argument before us that it is the intention of the city to treat the company fairly and to adjust its rates to meet its needs. Since that time the city has acted to keep this commitment. ’ ’
After the rate regulating authority was transferred to the city the Board of Estimate granted the following increases in fares to claimants:
7/1/50 New York City Omnibus 7^ to 8‡
7/1/50 Surface Transportation 8‡ to 10^
1/1/51 New York City Omnibus 8‡ to 10^
1/1/54 Surface Transportation 10^ to 13^
1/1/54 Fifth Avenue 12^ to 15^
1/1/54 New York City Omnibus 10^ to 13^
1/1/56 Surface Transportation 13‡ to 15^
1/1/56 New York City Omnibus 13^ to 15^
Hence it is clear that the statute did not constitutionally deprive claimants of their previously existing right to reasonable fares, but placed the duty to respect such rights upon the city acting either as a regulatory body or as a contracting party.
The claimants operated the nation’s two largest privately owned transit systems. Fifth operated 28 routes in Manhattan for an annual total of 22,000,000 revenue bus miles. Surface operated 49 routes in Manhattan and The Bronx for over 24,000,000 revenue bus miles per year. Surface provided nil the *220 surface transportation by public carrier in Tbe Bronx except for a minor Transit Authority service over tbe Whitestone Bridge. Fifth provided virtually all the franchised surface transit in Manhattan. Each working day of the year they transported about 1,250,000 passengers. The transit system served a major portion of the largest city and the best transit market in the United States. To some degree this bountiful market results from the fact that the per capita ownership of automobiles in New York County and Bronx County, the two areas served by claimants, is lower than in any other major urban county in the United States. It follows, therefore, that the respondent took the claimants’ transit systems as going concerns and has operated them as such ever since. The maintenance by the city of this transportation service demonstrates that the bus system is essential and complementary to, not competitive with, the overcrowded, inadequate subway system.
In fixing the award at $30,353,542 the trial court used reproduction cost new less depreciation, but the court improperly rejected the evidence proffered by the claimants as to the value of the intangible going concern assets, that is, the component of value in the business which in addition to the value of the tangible assets reflects an efficient operation. In disallowing pensions, mortgages, Federal and city taxes, equipment and bond indebtedness, all current obligations in excess of $19,000,-000, the trial court treated the take over as one of a going concern. These, of course, are the usual debts which are paid for out of the earnings of a going concern and similar debts are normally incurred by the going concern in the course of its continuing business. But there is a basic inconsistency in then applying a principle that no payment for seized going concern assets should be made when the continuance of earnings is shut off by condemnation. The reason given below is that where there is no earning capacity, even if only because the rates permitted to be charged are unreasonably low, there is no going concern value. However, in all the cases supporting the view that where there is no earning capacity there is no going concern value, the condemnees were inherently incapable of profitable operation because of the economic law of diminishing returns or inefficient management. Here had the city not suppressed the earning power of these transit lines by denying them, for *221 political reasons, the right to charge an increased and reasonable fare, they would have had large gains in gross revenues and greater gains in net profits as going concerns at the time of condemnation.
This record shows that every recent rise in fare on claimants ’ lines resulted in increases in profits even while claimants experienced a slight decline in passengers carried. The general experience in the transit industry in the United States has followed a pattern that for every 10% increase in fare there is only a 3% loss in traffic. Accordingly the increase in revenue attributable to a fare rise far outbalances the decrease in revenue attributable to a concomitant passenger loss. Indeed the Transit Authority stated with respect to this nationwide pattern that “ the average losses based on experiences in smaller cities are likely to be higher than might be expected in N. Y. City where the automobile is probably not as serious a competitor.”
Thus the record demonstrates claimants’ capability for profitable operations under reasonable rates and they are, therefore, entitled to going concern value (Kimball Laundry Co. v. United States, 338 U. S. 1, 19 [1949]; National Waterworks Co. v. Kansas City, 62 F. 853 [C. C. A. 8th, 1894]; People ex rel. Kings County Light. Co. v. Willcox, 210 N. Y. 479, supra [1914]).
The measure of value in this case is the cost of putting the entire transit systems together new plus all improvements, tangible and intangible, less depreciation. The cost of organizing and systematizing an enterprise in these days is many times the cost of a half a century ago. Consequently, the going concern’s intangible assets are equally as essential to the city’s ability to furnish bus service as are the tangible assets seized and used. These going concern attributes or so-called intangible assets such as coach routes, operating schedules, operating records and systems of procedures and trained personnel made it possible for the city to operate the transit system the day after the condemnation. Under the theory erroneously followed below, the assets in which the owners of the bus systems had invested substantial sums could be taken without compensation. These assets, without which the city would not have operated the system, can no more 'be taken without compensation than can its tangible corporate property.
*222 In condemnation cases it is “ necessary to appraise the physical property and the going value separately, and of course that is the case if the cost of reproduction rule he adopted. ’ ’ (People ex rel. Kings County Light. Co. v. Willcox, 210 N. Y. 479, 492, supra.) The rule was well defined in International Ry. Co. v. Prendergast (1 F. Supp. 623, 629 [U. S. Dist. Ct., W. D. N. Y., 1932]): “ In obtaining reproduction cost new, the value of the business as complete and ready to begin operations is ascertained. There must be added a going value, the value of the plant not as it is ready to begin operation, but the additional value which accrues because the plant is in operation with customers acquired.” Such increments for going concern value in addition to an award for tangible assets (valued at reproduction cost) must be allowed. (Omaha v. Omaha Water Co., 218 U. S. 180, 191-192 [1910]; McCardle v. Indianapolis Water Co., 272 U. S. 400 [1926]; Georgia Ry. v. Railroad Comm., 262 U. S. 625 [1923]; Bluefield Co. v. Public Serv. Comm., 262 U. S. 679, 686 [1923]; Denver v. Denver Union Water Co., 246 U. S. 178, 191-192 [1918]; Knoxville v. Water Co., 212 U. S. 1 [1909]; Los Angeles Gas & Elec. Corp. v. Railroad Comm., 58 F. 2d 256, 271 [U. S. Dist. Ct., S. D. Cal., 1932]; Denver Union Stock Yard Co. v. United States, 57 F. 2d 735, 744 [U. S. Dist. Ct., D. Col., 1932].) Indeed the majority of the court below recognized this and stated that the trial court had taken the going concern items into consideration in reaching its conclusion. In making this statement, the Appellate Division erred for it is clear that the trial court did not take the going concern items into account. In point of fact, it so indicated when, in the portion of its opinion devoted to “ Going Concern Values ” (46 Misc 2d 14, 25 et seq.), it declared “ No allowance may be made for Surface’s operating rights and permits nor for Fifth’s perpetual franchises for the reasons already stated in the discussion of the Nixon case [229 N. Y. 356, supra]. The other items [coach routes, operating schedules, etc.] are not supported by the cases urged by claimants.” (46 Misc 2d, p. 26.) If there could be any doubt as to the meaning of this excerpt, it is dispelled by a reading of the entire discussion concerning going concern value, for it is plainly stated that the only award made was for the reproduction cost less depreciation. It follows therefore that no allowance was made for the going concern items.
*223 And this is precisely the thrust of Justice Rabin’s dissent (23 A D 2d 463, 468-469):
‘ ‘ While, in an attempt to reflect ‘ going value the court appraised the real property, buses and other personal property on the basis of a depreciated reproduction cost rather than a ‘ break-up ’ market value, to my mind that does not fully reflect ‘ going value And I see no reason why the valuation should be so limited. The city’s only expert witness on the subject of going value — Mr. Edward A. Roberts — authored a book entitled ‘ Fair Value, Going Value, et al. of a Bus Utility.’ In this work he clearly indicates that giving ‘ reproduction cost new less depreciation ’ does not constitute compensation for ‘ going value ’. He calls such compensation an award for merely the ‘ bare bones value of a business property ’. I accept and agree with that statement of the city’s expert.
‘ ‘ It should be noted that Mr. Roberts did not refer to ‘ break-up ’ value as being ‘ bare bones ’ value. He was referring to value arrived at through the ‘ reproduction costs new less depreciation ’ method as being ‘ bare bones ’ value. And that is all that Special Term gave. And that is exactly what the city’s expert said does not constitute going value.”
The argument made by the respondent that going concern value should not be allowed where the court found an inadequate plant, dwindling profits and poor future prospécts was made long ago and rejected. (See Matter of City of New York [New York Water Serv. Corp.], 275 App. Div. 785 [2d Dept., 1949], mot. for lv. to app. den. 299 N. Y. 797 [1949].) In the New York Water Serv. Corp. case, which involved the condemnation of the Flatbush water supply, where that identical contention was advanced, the Appellate Division approved an allowance for going concern value in addition to compensation for tangible assets valued at reproduction cost new less depreciation.
In the case before us, claimants ’ property was a viable operative transit system and was taken as such, with a clearly expressed intent to so operate it after the forced transfer of title. Despite its annual transportation of a half billion riders, it had been approved by the city for eight years as safe arid adequate. Claimants’ undeniably competent and efficient personnel were taken over by the city along with claimants ’ routes, franchises, operating schedules, accounting and maintenance *224 records, etc. — all going concern assets for which, claimants must be duly compensated.
Accordingly the order appealed from should be modified, the matter remanded to Special Term for a determination of the value of the going concern assets as an addition to the amount heretofore awarded and, as so modified, affirmed, with costs.