## DADE COUNTY v. GENERAL WATERWORKS CORPORATION, et al.

No. 69-11918.

Circuit Court, Dade County.

February 16, 1971.

Thomas C. Britton, County Attorney, John G. Fletcher, Assistant County Attorney, and John R. Farrell, Miami, Special Counsel, for the petitioner.

Darrey A. Davis of McCarthy, Steel, Hector & Davis, Miami, for the defendants.

**J. GWYNN PARKER, Circuit Judge.**

*Opinion and order on hearing in limine:* This eminent domain proceeding came on for hearing in limine upon the questions presented by the county's fourth amended petition and the answer of the defendant property owners asserting affirmative defenses.

§73.061(1), Florida Statutes 1969, provides for a hearing in limine to settle all disputed matters properly before the court which must be determined prior to trial. In Wilton v. St. Johns County, 98 Fla. 26, 123 So. 527, 65 ALR 488, the Florida Supreme Court held that the statutes governing the procedure in proceedings for condemnation imply that the property owner is entitled by his answer to set up any valid defense which would show cause why his property should not be taken; and that such question should be determined by the court in limine, before impaneling a jury, because it is not necessary to try the issue of compensation if a preliminary question upon which the right to condemn depends is determined adversely to the petitioner. Eminent domain actions are divisible into two stages. The procedural statutes limit the trial solely to a determination of the amount of compensation to be paid for the property sought to be a appropriated, which is purely a factual issue. Before reaching the trial stage, all disputed matters or questions of law properly before the court should be settled. This first stage of the proceedings is accomplished by a hearing in limine as prescribed by the statute. Central Hanover Bank & Trust Co. v. Pan American Airways, 128 Fla. 736, 171 So. 808. See also Spafford v. Brevard County, 92 Fla. 617, 110 So. 451; Sibley v. Volusia County, 147 Fla. 208, 8 So.2d 578; and Miller v. Florida Inland Navigation District, Fla. App. 1961, 130 So.2d 615.

Accordingly, motion for a hearing in limine was granted pursuant to notice and hearing, and the parties required to submit briefs in advance of the hearing date. The court has had the benefit of extensive briefs and arguments of counsel, the record in this proceeding has been reviewed, and applicable authorities independently researched.

The substantive matters before the court for determination in limine involve consideration and construction of controlling provisions of the constitution governing eminent domain. Article I, §9, Florida Constitution, provides in pertinent part that no person shall be deprived of property without due process of law. Article X, §6(a), Florida Constitution, provides that —

> "No private property shall be taken except for a public purpose and with full compensation therefor paid to each

owner or secured by deposit in the registry of the court and available to the owner."

Under no circumstances can any private property be taken without due process of law, and in order that the requirements of due process be satisfied the property owner must be afforded substantive as well as procedural due process. Keating v. State, Fla. 1965, 173 So. 673. The substantive proscription of eminent domain is full compensation to the owner of all property taken. Full compensation means nothing less than full payment for that which the property owner is being deprived of. Meyers v. City of Daytona Beach, Fla. 1947, 30 So.2d 354. The theory and purpose of the guaranty of full compensation is that the property owner shall be made whole so far as possible and practicable. Dade County v. Brigham, Fla. 1950, 47 So.2d 602. The power of eminent domain may be exercised only when full compensation is provided to the owner for the private property sought to be taken. Any measure of compensation that provides less than full compensation, as determined by substantive standards, would deny to the property owner the fundamental guaranty afforded by the controlling constitutional provisions. It is well settled that the determination of what is full compensation for the taking of private property for public use is a judicial function. As stated by the Florida Supreme Court in Daniels v. State Road Department, Fla. 1964, 170 So.2d 846, 851 —

It is well settled that the determination of what is just compensation for the taking of private property for public use "is a judicial function that cannot be performed by the Legislature either directly or by any method of indirection." [citations omitted]

As stated in Baltimore & Ohio R. Co. v. U.S., supra, 298 U.S. 349, 56 S. Ct. 797, 80 L.Ed. at p. 1224:

"The just compensation clause may not be evaded or impaired by any form of legislation. Against the opposition of the owner of private property taken for public use, the Congress may not directly or through any legislative agency finally determine the amount that is safeguarded to him by that clause. If as to the value of his property the owner accepts legislative or administrative determinations * * * no constitutional question arises. But when he appropriately invokes the just compensation clause, he is entitled to a judicial determination of the amount."

And in Monongahela Navigation Co. v. U.S., supra, 148 U.S.312, 13 S.Ct. 622, 37 L.Ed. 463, in which the Supreme Court struck down an Act of Congress purporting to exclude an element of value [the franchise to collect tolls] in the purchase of the lock and dam of the Navigation Company, the court said that just compensation means that "a full and perfect equivalent for the property taken" must be returned to the owner, and that

"By this legislation congress seems to have assumed the right to determine what shall be the measure of compensation. But this is a judicial, and not a legislative, question. * * * *It does not rest with the public, taking the property,* through congress or the legislature, its representative, *to say what compensation shall be paid,* or even what shall be the rule of compensation. The Constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial injuiry." (Italics supplied by the court.)

And in State Plant Board v. Smith, Fla. 1959, 110 So.2d 401, 407, the court held —

. . . It is settled in this state that "the determination of what is just compensation for private property that is taken for public use is a judicial function that cannot be performed by the Legislature either directly or by any method of indirection." Spafford v. Brevard County, supra, 110 So. 451, 454 . . .

National City Bank v. United States, 275 Fed. 275, judgment affirmed 281 Fed. 754, writ of error dismissed 263 U.S. 726, holds that neither the Congress, nor the executive officers of the government, can determine what is just compensation for private property to be taken for public purposes, or prescribe rules of its computation, because the question is judicial and can be determined only by the court.

Due process requires that an owner whose property is to be taken for public use must be given a hearing on the determination of what constitutes just compensation. Walker v. Hutchinson, 352 U.S. 112, 1 L.Ed. 2d 178, 77 S.Ct. 200.

The record in this eminent domain proceeding discloses that, pursuant to recommendation of the county manager, the board of county commissioners declared a policy on January 7, 1969, of county acquisition through revenue bond financing and county operation of all the thirty-one privately owned water and sewer systems operating within Dade County. As an initial step, the county manager and county attorney on March 12, 1969, submitted to the board of county commissioners a proposed resolution authorizing Dade County to acquire the six water and sewer systems of defendants. The proposed resolution was accompanied by written recommendations representing in pertinent part as follows —

. . . Unlike most utilities, approximately half the actual investment reflected in the property of these utilities was invested by the stockholders and the remainder was "donated" or "contributed" either by the customer or, more typically, by a developer who passed the costs on to the homeowner who then became a customer. The utility was in a position of demanding and receiving this "contribution", because the developer and the customer could not do without the service and in most instances could not obtain the service except from one company and therefore was forced to "contribute" whatever was demanded by the utility, which was com-

pletely unregulated until 1960. County regulation since that date has, quite logically we believe, limited the return to the stockholders to a fair return upon their actual investment. The circumstances just outlined provide an entirely unique situation, so far as we have been able to ascertain, and therefore there is no established and accepted valuation of such properties for acquisition purposes.

We are confronted initially, therefore, with the option of paying whatever price the seller will accept or of seeking judicial establishment of the fair market value of these properties giving due consideration to the unique circumstances under which these properties were acquired and are operated. We believe it essential to the public's protection that we be prepared to acquire these properties through court proceedings with the value to be established by a jury and that we offer to pay no more than that price which our valuation experts advise us should be established by a jury plus the very considerable costs of legal and valuation services which under Florida law, again uniquely are imposed upon public bodies acquiring private property for public purposes through court proceedings. * * *

. . . The six companies we have recommended for immediate acquisition are jointly owned and operated by an out of state holding corporation and jointly provide water service to half the 70,000 customers served by all 31 companies. Three of the companies furnish sewer service.

We will make every effort to have these systems under public ownership and operation by the end of this year and these systems will provide a substantial nucleus around which to complete the acquisition of the remaining, smaller systems. We believe that the precedent established with this acquisition will facilitate the remaining acquisitions. * * *

We are presuming, of course, that the Board would not proceed if the cost of acquisition is exorbitant and that any costs which would require rate increases would be exorbitant. Since the costs will in all probability, be fixed in judicial proceedings, we have recomemnded that all acquisition and financing commitments are to be contingent upon subsequent Board action approving these commitments after determining their financial feasibility. * * *

We are assuming, of course, that our courts and juries will not make the public pay twice for these facilities, half of which were built with funds "contributed" at the point of an economic pistol by the customers. If we are wrong, we will have wasted considerable time, effort and money. However, the only way we can find out is to give our courts and juries the opportunity to decide the issue for us.

The board of county commissioners authorized acquisition of all property and assets of the six privately owned water and sewer companies by resolution no. R-314-69 adopted March 12, 1969, as prescribed by §127.02, Florida Statutes. It was provided that the water and sewer systems "can be most efficiently and effectively achieved by the acquisition of all the capital stock of such corporations." The board declared that acquisition thereof shall be "subject to approval and determination of the fiscal feasibility by the

board of the purchase price established either through negotiation or through eminent domain proceedings."

Pursuant to said resolution, the county on July 17, 1969, filed a petition seeking to condemn all the corporate stock of the corporations named therein, including authorized but unissued corporate stock. Defendants challenged the county's right to condemn the corporate stock involved by motion to dismiss.

Thereafter on February 18, 1970, the board of county commissioners adopted resolution no. R-209-70 amending and clarifying the previous resolution by declaring the intent to be "to acquire the assets of said companies whether by the acquisition of all of the capital stock of said companies, or otherwise." Acquisition of such property was authorized "subject to the approval and determination of the fiscal feasibility by the board of the purchase price established either through negotiation or through eminent domain proceedings."

The county's fourth amended petition filed on August 26, 1970, alleges that Dade County proposes to acquire by condemnation six water and sewer systems owned and operated by the defendants, General Waterworks Corporation, Community Utilities Corporation and GWC Waterworks Corporation. All the property, assets and business of these privately owned utilities are sought to be taken over as active going concerns "for the purpose of continuing without interruption and improving, expanding and integrating such systems in a single publicly owned and operated utility service." Inventories compiled by defendants listing the property, real and personal, and property rights utilized in the operation of said utility systems are made a part of the fourth amended petition.

The fourth amended petition shows that this eminent domain action is brought under authority of resolution no. R-314-69, as amended by resolution no R-209-70, which resolutions are made a part of the petition.

The answer of defendants to the fourth amended petition asserts affirmative defenses challenging the right of the county to maintain this eminent domain proceeding.

Defendants allege they are the owners of substantial and valuable property acquired as contributions in aid of the construction of extensions and additions to their water and sewer systems to provide utility services required to accommodate the needs of customers within the service areas granted to defendants, which contributed property is owned by defendants and constitutes private property; that such property is essential to the operation of the water and sewer systems and is an indispensable part of the property sought

to be taken, as shown by the inventories made a part of the county's petition.

Defendants assert that, under the controlling constitutional requirements, the county cannot lawfully appropriate, in eminent domain proceedings, the contributed property owned by defendants without payment of any compensation therefor.

Defendants contend that the resolutions which authorize this eminent domain proceeding and the acquisition of defendants' property are unlawful and invalid, and in the absence of any valid authorizing resolution, the county has no standing to maintain this proceeding.

Defendants raise the question of the good faith of the county in purporting to exercise the power of eminent domain for the purpose of attempting the acquisition of said private property in the manner and method prescribed by the authorizing resolution and the petition, and providing that the acquisition of defendants' property is subject to future approval and determination by the board of county commissioners of the fiscal feasibility of the purchase price, and declaring that the board will not approve an acquisition or the financing thereof unless it can be accomplished on the basis of the existing regulated rate base prescribed by the county.

The remaining defenses alleged in defendants' answer as the fourth defense and the fifth defense are insufficient as a matter of law and such defenses will not be given further consideration.

The power of the county to condemn private utilities upon payment of full compensation is not questioned. The taking over by government of the property and business of a public service corporation for the purpose of providing the same utility services under governmental, as opposed to private, auspices has been held to constitute a proper public purpose. While the power to condemn exists, it must be exercised in such fashion that, if the property is utimately taken, the owners will be fully recompensed by payment of full compensation, according to law. City of Palm Bay v. General Development Utilities, Inc., Fla. App. 1967, 201 So.2d 912.

The fundamental question which the parties present to the court for determination is whether or not the county has the right to acquire privately owned and operated water and sewer systems in eminent domain proceedings without liability for payment of compensation to recompense the owners for any property that they acquired as contributions in aid of the construction of their utility systems.

Petitioner points out that privately owned and operated water and sewer companies are regulated. The police power, as exercised

by Dade County through the Metropolitan Dade County Water and Sewer Regulatory Ordinance (chapter 32, Code of Metropolitan Dade County) provides for fixing and determining the rates and charges of water and sewer systems operating within Dade County, and requires that contributed property shall be excluded from the rate base and prohibits any return on any property acquired by the utility from its customers as contributions in aid of construction; no earnings, depreciation, or going concern value is permitted on contributed property. The validity of such regulations for rate-making purposes has been sustained. Southern Gulf Util. v. Metropolitan Dade County Water & Sewer Board, Fla. App. 1965, 180 So.2d 481; Westwood Lake, Inc. v. Dade County Water & Sewer Board, Fla. App. 1967, 203 So.2d 363

It is undisputed that the county is claiming it has the lawful power to acquire by condemnation privately owned water and sewer systems upon payment of compensation limited to evaluations arrived at by capitalization of the regulated earnings or income realized by the utility companies upon the rate base prescribed by the county regulations governing water and sewer rates, which exclude any value or earnings upon contributed property. This eminent domain action was brought to establish this method of valuation as a precedent for acquisition of all privately owned and operated water and sewer systems within Dade County. As stated by the county attorney "the only way we can find out is to give our courts and juries the opportunity to decide the issue for us."

The county argues that this is a question to be decided by a jury. Daniels v. State Road Department, supra, holds to the contrary.

Under the method of valuation advocated by the county for determining full compensation, in a situation where utility property is so restricted by the county in what it can earn, if it is losing money, or if the utility property is incapable of being profitably operated, then the county would be entitled to obtain that property in condemnation for nothing. No matter what capitalization rate is used, multiplication of the capitalization rate by zero earnings, or negative earnings, produces a value which is still zero or negative.

The so-called contributed property owned by defendants, and which the county seeks to acquire by condemnation, constitutes property within the meaning of article X, §6 (a), Florida Constitution. The term "property" has been defined as follows —

... Property, in a legal sense, consists in the domination which is rightfully and lawfully obtained over a material thing, with the right to its use, enjoyment and disposition. United Contractors, Inc. v. United Construction Corp., Fla. App. 1966, 187 So.2d 695, 701; Tatum Bros. Real Estate & Investment Co. v. Watson, 92 Fla. 278, 109 So. 623.

The manner in which defendants came to own this property does not operate to exclude it from the otherwise applicable constitutional requirements.

> Constitutional protection against confiscation does not depend on the source of the money used to purchase the property. It is enough that it is used to render the service. Board of Public Utility Commissioners v. New York Telephone Company, 271 U.S. 23, 70 L.Ed. 808, 46 S.Ct. 363.

In Peoples Natural Gas Company v. Pennsylvania Public Utility Commission, 153 Pa. Supr. Ct. 475, 34 A. 2d 375, the court held —

> . . . That appellant owns the property and is using it in the service is unquestioned. And, so long as present value is the test, *it makes no difference whether appellant bought it, received it as a gift, or won it in a lottery.* (Italics added.)

Re Marin Municipal Water District (California Railroad Commission) P.U.R. 1915C, 433 was a proceeding before the California Railroad Commission to fix just compensation for lands and property of a private water company. The question of valuation of contributed property was succinctly settled by the commission (at page 473) —

> As the property donated to the water company now belongs to it, the water company is, of course, entitled to have this property valued in this proceeding.

The condemnation of utility property is entirely different from the rate-making process. The complete dissimilarity between rate-making concepts and the just or full compensation standards which govern eminent domain have resulted in rejection of attempts to equate ratemaking with eminent domain as a basis for determining fair market value. As stated by the court in Onandaga County Water Authority v. New York Water Service Corp., 285 App. Div. 655, 139 NYS 2d 755 —

> . . . The complete lack of similarity between the original cost used in rate-making and the "just compensation" for the purpose of taking needs no comment . . . Further, an interpretation of [the statute] as fixing the rate base as a measure of "just compensation" would, at the least, be contrary to the legislative intent and, at the most, unconstitutional . . .

And in Puget Sound Power & Light Co. v. City of Payallup, C.A. 9th 1931, 51 F. 2d 688, the court said —

> . . . The problem presented in a condemnation proceeding is essentially different from that presented to a rate-making body or to the courts in the consideration of whether or not rates thus established are confiscatory. In condemnation proceedings, "just compensation" is the market value of the property taken. In rate-making cases the standard of market value of the investment cannot be applied in determining just compensation . . . The province of the court in such a matter is confined to the duty of preserving to the owner of property the fundamental right guaranteed

to him by the Constitution that his property shall not be taken from him without just compensation, and for that purpose to prohibit the nibbling away of his property by the fixing of rates which gradually but effectively destroy the value thereof.

The question of compensation in the condemnation of a privately owned utility is not determined by the value to the government which takes, but by the value to the owner from which the property is taken. Monongahela Navigation Co. v. United States, 148 U.S. 312, 37 L.Ed. 463, 13 S.Ct. 622; Onondaga County Water Authority v. New York Water Service Corp., 285 App. Div. 655, 139 NYS 2d 755. In *Onondaga,* a proceeding by the county water authority to condemn a water service company's property, the court held that the value to the authority on the basis of capitalization of earnings of the water system constitutes an unconstitutional method of valuation. The court said —

> Regardless of the principle of valuation adopted, all of the cases agree that "the question of just compensation is not determined by the value to the government which takes, but the value to the individual from whom the property is taken." Monongahela Navigation Co. v. United States, supra [148 U.S. 312, 13 S.Ct. 633]; Village of St. Johnsville v. Smith, 184 N.Y. 341, 350, 77 N.E. 617, 620, 5 L.R.A., N.S., 922; Matter of New York, W. & B. R.Co., 151 App. Div. 50, 55, 135 N.Y.S. 234, 238; United States v. Miller, 317 U.S. 369, 375, 63 S.Ct. 276, 87 L.Ed. 336. . . .

The court further stated that —

> . . . This test of value could never be accepted, let alone considered. It is based upon an erroneous principle of valuation — ability to pay, in this instance the measure of value to the condemnor, [citation omitted] Such criterion is *not* the value to the condemnee, but the price the condemnor can afford to pay. The fallacy of this test of value is fundamental; if carried to the extreme, it would lead to ludicrous results, and could never be considered as according the condemnee its constitutional guarantee of just compensation. While such an approach to value may have its practical application in a bargain and sale situation, such a limitation cannot be forced upon the unwilling seller. Limitations, practical or otherwise, upon the availability of the wherewithal to provide "just compensation" do not constitute the measure of that compensation. Furthermore, by basing the amount of the bond issue on estimates of the Authority's earnings from an expanded system, this approach to value in effect capitalizes and confers upon the company the enormous advantage of tax-free operation. (Italics by the court)

There are basic and fundamental distinctions between the condemnation of utilities, as here, and the conventional condemnation of property not otherwise devoted to public service. Utility condemnation involves the taking of the plant, system and business as a going concern which is to be converted from private to public ownership and operation. This is a case where the owners lose

their real estate, plant and equipment, their franchises, their customers and their business. It is not a commercial venture, which if the real property is taken, the business would not be destroyed since it could be moved to another location. In the conventional non-utility case, if the owner is conducting a business on the property condemned, he cannot claim as part of the compensation to which he is entitled, the value of his business. This is because, if the owner operates a business on the premises which are condemned to make way for a highway, or a housing project, or any other public purpose, the condemnor does not take the owner's business. The owner can relocate and reestablish that business. On the other hand, where a utility system is condemned, the condemnor not only takes the tangible and intangible properties of the owner, but it does so for the very purpose of enabling the taker to obtain and continue to operate the owner's business, which the owner cannot relocate or reestablish. As stated in Banner Milling Co. v. New York, 240 N.Y. 533, 148 N.E. 668 —

> There is a marked distinction between the instances where the State appropriates a public service corporation and all its business and good will as a going concern intending to continue its operations as a public enterprise (City of Denver, v. Denver Union Water Co., 246 U.S. 178; City of Omaha v. Omaha Water Co., 218 U.S. 180), and those instances where the State desires the land and not the business. Taking the land may cause the owner inconvenience and loss by compelling him to remove his business to some other place. Such loss, however, is not recognized as a part of the damage or compensation which the State must pay for the land taken. The reason for this distinction is quite apparent. When the business of a public service corporation is taken, the corporation goes out of business so far as conducting that branch of it is concerned. The business changes ownership from private to public control. The good will and all that goes with it is taken over by the State as *well as the tangible property.* This is not so with the condemnation of land for public purposes. Here the good will may be damaged by inconvenience and removal of the business, but it is not taken. The owner of the business may remove to another place, establish his business and carry his good will with him. (Italics added.)

And in Illinois Cities Water Company v. City of Mt. Vernon (1957) 11 Ill. 547, 144 N.E. 2d 729, 68 ALR 2d 384, a proceeding to acquire a waterworks system, the Illinois Supreme Court said —

> . . . Here we are not dealing solely with real estate which may be accurately described and inventoried at the time the petition is filed but largely with machinery, trucks, supplies, equipment, and other personal property, the number and description of which will change until such time as the transfer of ownership is accomplished. We must consider too that in order to comply with its certificate of convenience and necessity, appellee must constantly extend its service to those who need it. Because of these circumstances the ordinary rules of valuation must also

change so as to put the appellee in as good a financial condition after the transfer as it was before. Nothing short of such an amount conforms to the constitutional requirement of just compensation. . . .

Orgel on *Valuation under Eminent Domain*, vol. 2, pages 59-59 states —

> . . . the courts draw a distinction between the property that is "taken" and for which payment must be made, and the business that is not "taken" and for which no payment is required even though it is partly or completely destroyed by the taking of the physical property. But no such easy distinction can be drawn in the public utility condemnation cases. In the first place, the utility plant is uniquely adapted to the enterprise and cannot be separately sold. In the second place, the plant is so intimately connected with the remainder of the enterprise that the taking of the one necessarily means the destruction of the other. In the third place, while in the ordinary real estate condemnation, the taker acquires the property intending to convert it to a different use, in the condemnation of a public utility the taker not only destroys the company's chances of re-establishing the business but itself receives the benefit of customer connections, personnel and other intangible aspects of the enterprise.

> The courts have recognized these differences between the public utility cases and the more usual types of land condemnation. They have, accordingly, stated or implied that in the appropriation of a public utility, the entire enterprise is taken, or at least, something more than the physical assets. . . .

The usual method of determining the value of property to be taken by condemnation is by ascertaining market value. But there is hardly a market, in the usual sense, for a utility system, particularly a regulated utility. Resort must therefore be made to other tests of value. The Florida Supreme Court held in Jacksonville Expressway Authority v. Henry G. Du Pree Co., Fla. 1959, 108 So.2d 289, 291 that —

> Although fair market value is an important element in the compensation formula, it is not an exclusive standard in this jurisdiction. Fair market value is merely a tool to assist us in determining what is full or just compensation, within the purview of our constitutional requirement. * * *

> In the past this court has used additional tools in determining what constitutes just or full compensation in a particular case. . . .

The courts are unanimous in rejecting capitalization of earnings as a means of arriving at the value for condemnation of utilities. Orgel, vol. 2, pp. 71 and 78. Capitalized earnings cannot be considered as the controlling factor in arriving at value in eminent domain proceedings for taking utility property. City of Phoenix v. Consolidated Water Company, 101 Ariz. 43, 415 P. 2d 755, 769. All the texts and authorities support the principle that capitalization of earnings, while a factor relevant to a determination of the

additional value of that portion of the award compensating for the taking of the franchise or going concern value, is incompetent as a matter of law as a measure of the total value of the entire property taken. Thus, the income or economic approach (capitalization theory) urged by the county does not provide a lawful foundation for determining the full compensation to be paid for the taking of the water and sewer systems owned by defendants. For as Orgel says, the owner must receive the value of his tangible property, based upon reproduction cost new, less depreciation, plus franchise value, plus going concern value. Orgel on Valuation Under Eminent Domain, vol. 2, chap. XVIII, pp. 81-147.

The *Fifth Avenue Coach* litigation elaborates upon the applicable standards for determining just compensation in the case of a taking in eminent domain of utility property. In re Fifth Avenue Coach Lines, Inc., 18 N.Y. 2d 212, 219 N.E. 2d 410, the New York Court of Appeals considered the principles of law governing the evaluation of utility property (the nation's two largest privately owned transit systems) under the constitutional requirements of just compensation. The court said —

> The problems raised in this condemnation proceeding are difficult and to a degree unique. In this era of spiraling inflation such proceedings will continually reoccur since it is beyond the resources of private enterprise to provide mass transportation at modest rates, dictated by political exigencies and confiscatory as far as the equity in the business is concerned. However, "It does not rest with the public, taking the property, through congress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation." [citations omitted] . . .

The court further stated

> . . . However laudable the political motivation is in depriving claimants of their transportation system, they must be fully compensated therefor. In Matter of New York Edison Co. v. Maltbie, 244 App. Div. 436, 442, 279 N.Y.S. 949, 955 [3d Dept., 1935] the court stated: "This announcement indicates a motive to be generous toward needy rate payers with the money and property belonging to the utility companies. Some may regard this as desirable and the motive as praiseworthy, but 'the point is not one of motives, but of constitutional authority, for which the best of motives is not a substitute.' Panama Refining Co. v. Ryan, 293 U.S. 388, 420, 55 S.Ct. 241, 248, 79 L.Ed. 446 * * *.)"

The court then proceeded to lay down certain rules for the determination of the compensation to be awarded the utility owner for the taking of its system. The appellate court adverted first to the standard used by the trial court, saying —

> In fixing the award at $30,353,542 the trial court used reproduction cost new less depreciation, but the court improperly rejected the evidence proffered by the claimants as to the value of the intangible going concern

assets, that is, the component of value in the business which in addition to the value of the tangible assets reflects an efficient operation.

The appellate court, while fully agreeing with and vindicating the trial court's use of reproduction cost new, less depreciation, as the measure of value of the physical elements of the system, rejected the trial court's refusal to compensate for the intangible values of the system. The court said —

> The measure of value in this case is the cost of putting the entire transit systems together new plus all improvement, tangible and intangible, less depreciation.

The court went on, with the citation of extensive authority, to elaborate upon the applicable rules governing the ascertainment of just compensation. It said —

> In condemnation cases it is "necessary to appraise the physical property and the going value separately, and of course that is the case if the cost of reproduction rule be adopted" (People ex rel. King's County Light Co. v. Wilcox, 210 N.Y. 479, 492, supra.) The rule was well defined in International Ry. Co. v. Prendergast (1 F. Supp. 623, 629 [U.S. Dist. Ct., W.D.N.Y., 1932]): "In obtaining reproduction cost new, the value of the business as complete and ready to begin operations is ascertained. There must be added a going value, the value of the plant not as it is ready to begin operation, but the additional value which accrues because the plant is in operation with customers acquired." Such increments for going concern value in addition to an award for tangible assets (valued at reproduction cost) must be allowed. (Omaha v. Omaha Water Co., 218 U.S. 180, 191-192 [1910]; McCardle v. Indianapolis Water Co., 272 U.S. 400 [1926]; Georgia Ry. v. Railroad Comm., 262 U.S. 625 [1923]; Bluefield Co. v. Public Serv. Comm., 262 U.S. 679, 686 [1923]; Denver v. Denver Union Water Co., 246 U.S. 178, 191-192 [1918]; Knoxville v. Water Co., 212 U.S. 1 [1909]; Los Angeles Gas & Elec. Corp. v. Railroad Comm., 58 F. 2d 256, 271 [U.S. Dist. Ct., S.D. Cal., 1932]; Denver Union Stock Yard Co. v. United States, 57 F. 2d 735, 744 [U.S. Dist. Ct., D. Col., 1932]).

Finally, the court in *Fifth Avenue Coach* took specific cognizance of the condemnor's claim that the owner was entitled to no compensation for going concern value where it had not operated profitably in the past or its prospects were poor for the future. It said —

> The argument made by the respondent that going concern value should not be allowed where the court found an inadequate plant, dwindling profits and poor future prospects was made long ago and rejected (See Matter of City of New York [New York Water Serv. Corp.], 275 App. Div. 785 [2d Dept., 1949].) In the New York Water Serv. Corp case, which involved the condemnation of the Flatbush water supply, where the identical contention was advanced, the Appellate Division approved an allowance for going concern value in addition to compensation for tangible assets valued at reproduction cost new less depreciation.

Nichols states (4 *Nichols On Eminent Domain,* 3rd Ed. 1965, §12.1) —

> The "just compensation" to which such owner is entitled has been held to be the *value* of the property at the time it is acquired pursuant to an exercise of the sovereign power. It has been held to be equivalent to the *full value of* the property. (Italics added.)

The procedural statutes governing eminent domain proceedings (§73.021, Florida Statutes) require that the condemnor's petition shall set forth the authority under which the property is sought to be acquired. In county eminent domain proceedings, §127.02, Florida Statutes, provides for the adoption of a resolution by the board of county commissioners authorizing the acquirement by eminent domain of property for any county use or purpose. Proper and lawful authorization is a prerequisite for maintaining eminent domain proceedings. Eminent domain proceedings may not be maintained in the absence of a valid authorization. City of Miami Beach v. Cummins, Fla. App. 1970, 233 So.2d 842.

The record and proceedings on hearing in limine establish that the authorization under which this eminent domain action is maintained purports to contingently authorize Dade County to take over and convert privately owned water and sewer systems to county ownership and operation provided such property can be acquired without payment of compensation for the so-called contributed property under a method of valuation prescribed by the county. The basis which the county is seeking to establish for taking over the water and sewer systems would deprive the owners of their constitutionally protected rights. The power of eminent domain cannot be exercised in a manner designed to acquire any private property without payment of full compensation. The necessity for the taking is cast in doubt if the water and sewer systems are not to be taken over for public use unless they can be acquired at a price acceptable to the county. As stated in City of Palm Bay v. General Development Utilities, Fla. App. 1967, 201 So.2d 912, 916 —

> . . . While petitioner has the power to condemn, it cannot exercise this power to completion unless and until the necessity for the taking is established and the defendant is fully recompensed by payment of just compensation, all according to law.

There is a marked difference between a condemning authority undertaking to prescribe in advance the sole measure of compensation or method by which it shall be determined, and ultimately declining to complete the acquisition of property, for economic or other considerations, by exercising the procedural prerogative afforded by the provisions of §73.111, Florida Statutes.

In consideration of the controlling constitutional and statutory provisions, and for the reasons stated, the court finds for the defendants, and against the petitioner, on the questions of law presented for determination in limine by the second and third defenses asserted in the answer of the defendants to the fourth amended petition. The court finds for petitioner, and against defendants, on the matters raised by the fourth and fifth defenses contained in the answer.

Accordingly, it is ordered and adjudged as follows —

(1) Petitioner, Dade County, a political subdivision of the state of Florida, has the right to exercise the power of eminent domain to acquire the water and sewer systems owned and operated by the defendants, General Waterworks Corporation, Community Utilities Corporation and GWC Waterworks Corporation, but petitioner cannot lawfully exercise its power of condemnation to completion and take over and convert the utilities to county ownership and operation without providing for payment of full compensation as determined and measured by a method of valuation under a legal rule of compensation that will fully recompense the owners for the value of all the properties sought to be appropriated.

(2) Petitioner is constitutionally prohibited from exercising its power of eminent domain to take over said water and sewer systems under and by virtue of legislative or administrative determination that the compensation to be paid therefor shall not exceed a valuation based solely upon capitalized earnings upon the regulated rate base, excluding any value, return or earnings on contributed property owned by the utilities. To permit the utilization of this method of valuation as the sole or controlling basis for proof of fair market value would authorize petitioner to take private property for public use without payment of full compensation to the owners thereof, contrary to the fundamental requirements of the Florida Constitution.

(3) Resolution no. R-314-69, as amended by resolution no. R-209-70, of the board of county commissioners of Dade County, Florida, in so far as it purports to authorize petitioner to acquire the water and sewer systems of defendants upon the basis of said method of valuation, is invalid and unconstitutional and fails to provide proper authorization for the prosecution of eminent domain proceedings.

(4) The fourth amended petition is dismissed, with leave to file a fifth amended petition upon proper authorization. Petitioner is allowed the period of thirty days from and after the date hereof within which to file such amended petition.