■ In the Matter of TOWN OF HEMPSTEAD, Respondent, v LEE ASSOCIATES, INC., Appellant. — In a condemnation proceeding, the claimant appeals, as limited by its brief, from so much of a final order of the Supreme Court, Nassau County, entered December 26, 1979, as awarded it only $15,800 for the taking of a certain parcel. Final order modified, on the law and the facts, by increasing the first taking award from $15,800 to $58,361. As so modified, final order affirmed insofar as appealed from, with costs to the appellant. The subject of this condemnation proceeding is a parcel of land located in Woodmere, Long Island, in the Residence B single-family district in which the minimum lot is 6,000 square feet. The parcel is improved with an estate-type house fronting on an 8.36 acre man-made elongated lake known as Lee Lake. The first taking (Jan. 10, 1974) was of the 8.36 acres of

land under Lee Lake, together with two surface easements. Special Term awarded the owner a total of $15,800, including nominal damages of $8,500 for the lake, $800 for the surface easements, and the remainder ($6,500) for loss of riparian rights and a dock. The award for the second taking (Jan. 20, 1976) of 1.45 acres of upland (containing nine plots) which remained with the claimant after the first taking was $180,100. Claimant Lee Associates, Inc.'s appeal is limited by its brief to the award granted for the first taking. It asserts that the award was grossly inadequate and that the Town of Hempstead should pay the "$1,060,000" total cost of acquiring the nearly eight and one-half acres at another location and there creating a substitute lake, or that, alternatively, the town should pay "$200,000" damages on the theory that, by filling the seized lake, it could have been economically and profitably developed into residential acreage. The subject property was originally part of a large tract of woodlands, meadowlands, bog and marshlands (in which is now the unincorporated area of Woodmere), acquired more than 75 years ago by Franklin B. Lord, who constructed a country home on these lands. Much of the property was part of the low-lying bog and marsh which was subdivided as the map of Lord Estates at Cedarhurst and filed with Nassau County in 1926. Subsequent to the filing of the map there were sporadic sales of the mapped lots, but neither streets nor utilities were installed, and potential development was halted by the depression. During the life of Franklin B. Lord, the house was well maintained, but after his death it met with fire and vandalization, and fell into general disrepair. After World War II the Lee family acquired the Lord house and much of its surrounding land, and completely restored, renovated and modernized the dwelling, completing the major portion of this work in the early 1950's. In the period subsequent to 1952 the claimant was engaged in the residential development of other properties in the immediate area. The land now under water on the subject property had served as a convenient source of fill to facilitate the construction of homes on the adjacent lands owned by the claimant. These lands under water (Lee Lake) presently serve as a storm drainage basin for the surrounding residentially developed areas. Throughout the years claimant had granted drainage easements to the town in order to provide adequate drainage for various sections of the unincorporated area of Woodmere, including areas to the east and west of Lee Lake. On March 25, 1969 the parties entered into a written agreement resolving disputes that had arisen with respect to the easements. The agreement made clear that the claimant was then filling parts of the lake, and the town agreed to "install *without delay* an appropriate underground drainage pipe" (emphasis supplied) in one of the easement areas. An easement designated as "No. 1" in the agreement provided that the town would have the right to maintain open drainage throughout the easement area but the claimant had the right to fill the "ditch" if appropriate drainage pipes were installed. Paragraph 6 of the easement agreement provided that claimant and Sally W. Lee "shall have the unlimited right to use said premises, or any portion thereof, for any purpose whatsoever, *including the filling of land and the construction of buildings thereon, provided such use does not interfere with the purpose of said easements* and provided that prior to filling any open drainage ditch an underground drainage pipe is installed as hereinbefore required" (emphasis supplied). In 1972 a dispute over Lee Lake arose following complaints that its owner, Dr. William Lee, was dumping construction debris into the water as a prelude to building homes on the site. Lee's critics protested and the town obtained an injunction to stop the dumping. Town officials then proposed a five-year agreement with Lee un-

der which he would provide a scenic easement for the Lee Lake area and yet retain title, while the town took over the responsibility of costs and maintenance. As a result of ensuing homeowner protests that this agreement was not permanent, the town instituted this condemnation proceeding to acquire the lake for "open space" purposes. At the trial, claimant contended it was entitled to be awarded funds sufficient to enable it to create (at a $210,000 depreciated cost) an equivalent lake on land to be purchased at $100,000 per acre at another location. Thus its expert calculated damages as follows:

| | |
|---|---|
| "Value Before Taking | $2,000,000 |
| Value After Taking (1) | 786,475 |
| Total Damages | $1,213,515 *[sic; should be $1,213,525]* |
| Comprised of: | |
| Direct Damages | |
| 8.6938 acres at $100,000 ac. | $ 869,300 |
| Landscaping — dock & pilings (Marshall Valuation Service) | 22,500 |
| Lake | 210,000 |
| Total Direct Damages | $1,101,800 |
| Remainder Non-Direct Damages to Land and Improvements | $ 111,715". |

The legal rationale for this theory is noted in the report of claimant's appraiser, which quotes from a letter written by claimant's counsel: " 'Together with you, we have concluded that traditional market approaches to valuing such lake would result in manifest injustice to the property owner. This result comes about because of the total lack of a market for private lakes in Nassau County and because utilization of comparable land sales presumes that the lake be filled, thus reversing the creation of the lake. This was the very reason the subject property was acquired by the Town of Hempstead. Valuing the land as filled (the alternative proposal) would result in a double loss to the property owner: the cost of creating the lake and the cost of filling the lake.' " We find no basis for an award on this "summation" theory, viz., the $210,000 depreciated reproduction cost of the lake on land to be purchased at $100,000 per acre. Lee Lake was artificially created by claimant by dredging it of fill, which was then used to develop nearby marshland into residential plots. It thus previously extracted value from the lake in the form of the prices obtained on the sale of those residential plots with a lake view. Immediately prior to this condemnation proceeding claimant was reversing the process, i.e., it had begun to fill in the lake land — again to develop and sell residential plots. Under all the circumstances, a "summation" award whether on a specialty theory (see *Matter of County of Nassau [Colony Beach Club of Lido]*, 43 AD2d 45, affd 39 NY2d 958), or some "manifest injustice" concept (see *Matter of Port Auth. Trans-Hudson Corp. [Hudson Rapid Tubes Corp.]*, 20 NY2d 457, 469; *Matter of City of New York [Fifth Ave. Coach Lines]*, 18 NY2d 212; *City of New York v State of New York*, 49 AD2d 659) is unwarranted. The town's appraiser was of the opinion that "because the subject property is zoned Residence 'B', permitting one-family construction on 6,000 square feet, the subject property as a one-family residence enjoys excess lands which have been analyzed on the basis of their potential for residential development." Noting that the property could be divided into four major areas (Parcels A [approximately 1.45 acres],

B [8.36-acre Lee Lake], C [containing the Lee residence], and D), he stated in his appraisal report that the highest and best use of Parcels A, C and D was for residential development with the consequence that the highest and best use of Parcel B was its existing use as a drainage basin for the adjacent land. The appraiser had been of the opinion that the Lee Lake parcel (Parcel B) *also* had potential for subdivision but an engineering study by a firm commissioned by the town showed that the extraordinary development costs of filling in the lake and bringing it to buildable grade precluded its residential development. According to the appraisal report, the value of the property as raw acreage would be $92,000 per acre if at buildable grade and available for immediate development at normal costs. As to the cost of creating buildable plots, however, the town appraiser resorted to the following table:

"Estimated Gross Value
8.36 raw acres × $92,000. per acre
(if at grade)   R.F. $769,100.

Extraordinary Costs (to bring subject property to grade)

| | |
|---|---:|
| Fill | 645,812. |
| Storm Drainage | 268,880. |
| Retaining Wall | 30,565. |
| Storm Drainage at Retaining Wall | 28,880. |
| Engineering | $ 26,000. |
| | $1,000,137. |
| | R.F. $1,000,100." |

He therefore concluded that development of the 8.36-acre lands under water was not economically feasible since the direct costs alone exceeded by $231,000 the value created. Furthermore, there would be additional costs for carrying the property while it was being filled, plus costs for the normal development of raw acreage such as road pavement, sidewalks, curbs, aprons, and sanitary sewers. Nevertheless, the appraiser concluded that no property is totally without value and evaluated it on the basis of $1,000 per acre for a rounded value estimate of $8,500. Special Term agreed with that assessment: "In summary, the Court finds the claimant suffered only nominal damages in the taking of Lee Lake * * * and makes no award except for $15,800 which includes nominal damages of $8,500 for the lake, $800 for the surface easements acquired in the taking, and the remainder for the loss of riparian rights and the dock." As may be seen, the major cost items that resulted in the town appraiser's conclusion that making the property usable for residential development would result in a loss of $231,000, are the $645,812 cost of purchasing and installing fill and the $268,880 storm drainage item. The $645,812 item was derived from an engineering study commissioned by the town which reported that residential development of Parcel B would require 311,250 cubic yards of fill at a unit price of $1.85, the total cost of which would be $575,812 plus $70,000 to place the fill. We find, however, that the town experts' cost estimates were based on the unnecessary and erroneous assumptions that the property (if filled to grade) would be developed to its maximum, yielding 50 plots; that a rigidly prescribed schedule would have to be followed in order that claimant not breach its obligations under the easement agreement; and that such 50-lot

development, rigid schedule and easement agreement would require claimant to install an 84-inch pipe costing $227,200; to pay a market price of $575,812 for Parcel B fill and to expend $70,000 to place the fill — a total fill expense of $645,812. The claimant, although arguing on this appeal for the reproduction cost of the lake parcel, also argues that as an *alternative* the evidence permits a lesser award based on a smaller scope, *economical* residential development. Claimant contends that (1) the use of *free* fill, and (2) the utilization in Easement No. 1 of an open ditch in lieu of the purchase and installation of 84-inch pipe (which ditch alternative would reduce the scope of the development to 30 lots) would eliminate vast cost obstacles envisioned by the town experts. Thus claimant poses two alternative approaches:

| Explanation | "Assuming Lot Yield At 39 | At 30 |
|---|---|---|
| Total costs per Carlin [town's engineering expert] | $1,275,591 | $1,275,591 |
| *** | | |
| Less Savings: | | |
| (a) By using free fill | $ 575,812 | $ 575,812 |
| (b) By piping for easement #1 | 85,200 | |
| (c) By eliminating 84" pipe for open ditch #1 easement | | 227,200 |
| TOTAL SAVINGS | 661,012 | 803,012 |
| Corrected Costs | $ 614,579 | 472,579 |
| Value ready to build found by Special Term | 810,726 | 623,640 |
| *** | | |
| Less corrected costs | 614,579 | 472,579 |
| Indicated value 'As-Is' | $ 196,147 | $ 151,061". |

We find that the testimony, the easement agreement and other exhibits in this factually complex case support and require an award to claimant on the above alternative theory on the basis of a 30-lot yield, but that in view of the range of evidence as to the cost of fill, claimant's estimated "free fill" saving of $575,812 is excessive. Just as the town's evidence that development would require 311,250 cubic yards of fill at $1.85 a cubic yard (total of $575,812) is based upon erroneous assumptions of maximum lot development, a rigid time schedule, and a misreading of the easement agreement, claimant's contention that fill could be obtained entirely free is partially erroneous. Its witness, Joseph Farley, executive vice-president of a large contractor, testified that he probably could get 200,000 yards of fill "for nothing" and could actually charge someone to dump a certain type of fill "and *perhaps I may have to pay a dollar to $1.50, let us say for 50,000 yards,* but I definitely would incur income if I had this hole in the ground" (emphasis supplied). Joseph Gibbons, chief engineer and vice-president of a construction company, testified on behalf of claimant that "in those years [1974-1978] on the sewer contracts that we were doing" his company averaged a surplus of suitable fill of approximately 80,000 to 100,000 yards per contract. During 1974 and 1975 the company had at least four contracts and was dumping fill in various areas. Gibbons declared that his company did deliver fill for as much as $20 a load, but that was a very small amount compared to what was actually dumped for nothing. In view of the range and quality of the evidence,

we conclude that claimant's $575,812 "free fill saving" is excessive to the extent of $100,000. Thus claimant's proposed "As Is" value of $151,061 for the lake should be reduced to $51,061, an increase of $42,561 over Special Term's $8,500 award for the land under Lee Lake. Accordingly, the total award of $15,800 should be increased to $58,361. This increase in the award takes cognizance of the fact that claimant's prior developmental activities at the site and the fill activities leading to the suit brought by the town to enjoin claimant's fill operations and the condemnation itself are manifestations that claimant was not disposed to commit economic suicide by engaging in unprofitable developmental activities and that to the extent indicated by our modification the underwater lands had more than nominal value. Lazer, J. P., Gibbons, Gulotta and Cohalan, JJ., concur.