Burke, J.
This appeal presents for review a second time a portion of the condemnation awards for the Fifth Avenue Coach Lines, Inc., and Surface Transit, Inc., the nation’s two largest privately owned municipal transit systems. Since the condemnation in 1962, eight opinions have been written in an attempt to properly value the tangible and intangible going concern assets of these enterprises. The value of the tangible assets—$30,353,542 — has been confirmed. (Matter of City of New York [Fifth Ave. Coach Lines], 18 N Y 2d 212.) The valuation of the intangibles, necessitated by the continued use in public service of claimants’ property, has proved to be quite troublesome as evidenced by the history of this litigation, is presently unresolved, and provides the subject matter for this appeal.
In its initial decision, Special Term applied two conflicting rules and yet reached the same conclusion in determining claimants’ going concern value. (46 Misc 2d 14.) At one point, citing Banner Milling Co. v. State of New York (240 N. Y. 533),[1] it was held that, in a condemnation proceeding, a separate valuation was not required for going concern value so long as claimant was allowed full value for the tangible assets, appraised as a going concern. (46 Misc 2d, pp. 26-27.) In the opinion of the court, an award exceeding 30 million dollars was ample *619 compensation for both the tangible and intangible assets, thus acknowledging that the intangibles had value and yet concluding that no additional award was required for this value.
At a subsequent point in the opinion, the court chose to abandon this position. In so doing, it was noted that Mr. Justice Cardozo had stated in Roberts v. New York City (295 U. S. 264, 282) “ Substantial prices are not paid for the privilege of conducting a business at a loss ”. (46 Misc 2d, p. 29.) Using this as its premise, Special Term concluded that, as claimants were not operating at a profit at the time of condemnation, they were not entitled to an award for going concern value. Accordingly, no award was made for these categories of intangible assets: coach routes; operating schedules; operating systems, records and procedures; trained personnel; layout of bus garages and shops; operating rights, permits and perpetual franchises. The Appellate Division affirmed, one Justice dissenting.
At the conclusion of an appeal from that order, it was the opinion of this court that the holding below was premised on a mistaken belief in the condemnee’s inherent incapability to operate at a profit. (18 N Y 2d, p. 220.) In fact, these condemnees — Fifth Avenue Coach and Surface Transit—whose personnel were both competent and efficient, were operating at a loss solely because of the restrictive rate structure imposed on them. (Id., pp. 220-221.) We found claimants to possess a viable, operative transit system presently capable of profitable operations under reasonable rates, thus rendering inapposite the reasoning employed by the courts below. It was the opinion of a majority of this court that the present capability to operate at a profit was indeed sufficient to entitle claimants to an award for their intangible assets.[2] (Id., p. 221.) Having concluded that an award should be made for these assets, we further stated that “ The measure of value in this case is the cost of putting the entire transit systems together new plus *620 all improvements, tangible and intangible, less depreciation.” (Ibid.) The matter was then remanded to Special Term for the purpose of determining what these intangible assets were worth, based upon a reproduction cost less depreciation formula. Special Term, applying a different formula incorrectly,[3] subsequently found that the value of the intangible assets of both Fifth Avenue Coach and Surface Transit was $2,577,500, distributed as follows:
Trained Personnel ................. $2,337,500
Operating Schedules................ 240,000
Coach Routes ...................... 0
Operating Systems, Procedures and
Records ......................... 0
Franchises, Operating Rights and
Permits ......................... 0
Garage and Shop Layouts........... 0
Total ......................... $2,577,500
This award was affirmed by the Appellate Division. (29 A D 2d 638.)
Cognizant of the fact that we do not review an affirmed finding of fact based upon the evidence (see Diocese of Buffalo v. State of New York, 18 N Y 2d 41, 45; St. Agnes Cemetery v. State of New York, 3 N Y 2d 37, 40) and aware that findings of value supported by substantial evidence are immune from our *621 probing (Matter of City of New York [Sound View Houses], 307 N. Y. 687, 688), we nevertheless conclude that this case must again be remanded to Special Term as certain findings are not only at variance with the proof, but contrary to it.
As shown above, four of the six classes of intangibles were found to have no value by the courts below. Of these ‘ ‘ worthless ” assets, claimants valued most its coach routes, contending that they were worth $6,870,000. This figure was apportioned between the cost of laying these routes ($730,000) and the cost of continuing their development ($6,140,000).
With reference to the laying of the routes, the court below stated that ‘ ‘ no study was or would be required to determine that, in Manhattan, buses should be operated on the north-south arteries and on the main crosstown streets ” so that “ a prudent buyer would have no need to, and would not, make any study as to the layout of bus routes.” Indeed, the argument has been made that the potential routes in New York City are both obvious and limited, so that neither expertise nor imagination would be required to select them.
Such statements, however, are irreconcilable with the facts. We are concerned with 73 bus routes covering 46,000,000 passenger miles and providing virtually all the surface transportation in Manhattan and The Bronx with some additional routes in Queens. It cannot be seriously contended that all streets in The Bronx, where more than half the routes were laid out, conform to the geometrical pattern of north, south, east and west, to which the courts below attributed such significance in finding that the routes had no value. In addition, while this pattern does exist through downtown and midtown Manhattan, there are complex routing problems even in this area. How, for example, should Central Park be circumnavigated by the buses? Clearly, such a question could not be answered without considering, inter alia, where potential passengers live, how they travel, their present destination, and what the traffic problems are in the area. Without such considerations, an effective route would be impossible. The crosstown buses on 57th Street illustrate the results of such comprehensive planning. Two buses proceed side by side crosstown west to east until their routes part, one bus turning uptown and the other *622 downtown, so that they are nearly 20 blocks apart at their final destination. In light of this, the determination below that “ a prudent buyer would have no need to, and would not, make any study as to the layout of fins routes ’ ’ is not a binding conclusion.
Closely associated with this claim for route layout is the sum sought for route development. Route development can best be defined as the plans and studies which are made to insure maximum patronage, once a route has begun operations. Claimants’ expert witnesses testified that it is customary “in the industry * * * to use 10 per cent of a year’s gross revenues as being indicative of this loss in earning power ” incurred until routes are developed. In disposing of this claim, the court below noted that, since Manhattan and The Bronx represented the best transit market in the country, “ it was not necessary for claimants to solicit or advertise for business, nor to do gratuitous work, nor to operate at a loss in order to educate the public up to the maximum point of patronage.” We disagree.
As Mr. Justice Frankfurter points out in Kimball Laundry Co. v. United States (338 U. S. 1, 10-11), intangible going concern value, as a whole, increases with the probability of continued patronage. Fifth Avenue received its first franchise for horse-drawn vehicles in 1880. Claimants have, since then, added on the average of one new route per year- It is not disputed that many of these routes have been modified to meet the city’s increased population and to adjust to the commercial and residential changes that have taken place since the turn of the century. Such adjustments necessarily involved expense, As the city’s principal expert witness at the first trial testified: “ the routes of the company may have an attached traffic sufficient to pay for the service and representing substantial value to any prospective purchaser.”
As the routes have changed, so too have the conveyances. Thus, the horse-drawn carriages gave way to electric cars and the latter have been replaced fiy buses. That such advancements, designed to retain customers as well as to attract additional patrons were successful is best evidenced by the fact that, in the year preceding condemnation, claimants served a half *623 billion riders. Clearly, such efforts were not undertaken without considerable expenditures—expenditures for which an award must be made.
Columbus Gas Co. v. Public Utilities Comm. of Ohio (292 U. S. 398), a utility rate fixing case, fails to sustain the award of no value for route development. In his opinion, Mr. Justice Caedozo stated: "The burden of building up patronage may be negligible where there is little competition ” with other competitors. (Id., p. 413.) His subsequent remarks, which were accorded great weight by the court below, are here inapplicable in light of the nature of this litigation and because of the claimants’ competitors — rapid transit, private automobile and taxi. Accordingly, Special Term’s finding of no value for claimants’ continuous efforts, over a period of 75 years, to attract and maintain patronage is not a valuation determination binding on this court.
A second claim rejected in toto by Special Term, for $3,546,500, was attributed to the operating systems, records and procedures of claimants. This claim has three components, which were treated separately by the court below. The first and most extensive element of this claim pertains to the accounting records and systems of procedures. Claimants sought compensation for 171 different records and reports produced by their accounting departments. The information contained in each document was explained by experts, using both charts anc[ prepared text. The reproduction cost of each document was established by showing the number of postings on each record, the salary of the posting clerk and the overhead expenses attributable to clerical personnel. Finally, testimony was presented regarding the period of usefulness for each record. The total cost of reproducing these documents, giving consideration to each of the above factors, was $2,127,500. At the conclusion of this testimony, claimants’ expert, a Mr. Trentin of the accounting firm of Arthur Andersen & Co., stated on cross-examination:
“ Q. I now ask you for your expert opinion. If all of the accounting records of the claimants were destroyed by fire or some other catastrophe and Arthur Andersen & Company were asked to design and install a new accounting system for these *624 claimants, would you recommend reproduction of the accounting system and records as they existed at the time of your computation for the purpose of these proceedings? A. No.”
Special Term erroneously denied the entire claim for accounting records solely on the basis of this one answer.
It has long been settled that, in evaluating intangibles, consideration should be given solely to the present system, without regard for different, more modern methods. (McCardle v. Indianapolis Water Co., 272 U. S. 400, 417-418.) Our own courts have stated the rule quite clearly—“ "It is this system [the condemned one] that is to be appraised, in its present condition and with its present efficiency. ’ ’ ’ (Onondaga County Water Auth. v. New York Water Serv. Corp., 285 App. Div. 655, 665, quoting Kennebec Water Dist. v. City of Waterville, 97 Me. 185, 216.) The finding of no value for the accounting records, premised on a factor which cannot be considered by the court, must, therefore, be set aside.
The second subdivision, in the amount of $360,000, was for the maintenance records and systems of procedures. The court, in valuing this claim, chose to accept the testimony of the city’s expert that the maintenance records were covered with dust,[4] that they were seldom used, and that they did not make available the cost per mile for maintenance of engines, transmissions and the like, by location and by bus model. It is nevertheless evident that these records were used, albeit infrequently, that they were taken over by the city and that the system of maintenance was not so poor as to prevent the city from obtaining a fleet of buses operable at the time of condemnation. In view of this, we do not accept the finding of no value.
The third portion of this claim was for personnel records, valued by claimants at $1,059,000. As noted below, this included all the reports and other information collected pertaining to each employee from the time of his application until the termination of his employment. Specifically, each employee’s file contained his initial application, any investigatory data collected in processing the application, records of his training reports showing his progress and the results of his training, records of his *625 assignments during his term of employment, accident reports, reports from supervisors, attendance charts, reinstruction information, public complaints as well as commendations, payroll records and deduction authorizations, and memoranda relating to any disciplinary action which may have been necessary during the time of his employ.
The entire claim for personnel records was dismissed for two separate and independent reasons: “ no competent evidence was adduced as to the cost of reproducing such records ” and “ it is not apparent why any buyer would pay for such material. ’ ’ Having reviewed the record, it is our opinion that this finding of no value cannot be sustained on either of these grounds.
In substantiating their claim, claimants employed the same detailed valuation techniques here as they did for the accounting records. Work sheets, prepared by an expert, were submitted showing the cost of reproducing the personnel files for all those employed at the time of condemnation. The cost of individual records was established, and the final claim was proved in this manner. In light of this extensive documentation, we cannot concur with the court’s statement that “ no competent evidence was adduced as to the cost of reproducing such records ”.
Aside from the claimants’ present contention that many of these personnel records are required by law, the very nature of the information contained in them is prima facie evidence that these records were essential in evaluating and classifying each of the nearly 6,000 active employees at the time of condemnation. It cannot be seriously argued that a work force this big can be properly deployed, evaluated, and supervised without personnel records as extensive as those maintained by claimants. As these records were taken over at the time of condemnation, claimants are entitled to an award for them, following the formula of reproduction cost less depreciation.
Claimants also sought $3,000,000 for operating rights, permits and perpetual franchises. Of the franchises possessed by claimants, 10 were not officially condemned. The remaining ones (which were condemned) were nonexclusive.
It is well established that a franchise, a form of property, is protected both by the State and Federal Constitutions against *626 substantial curtailment or destruction by the government without payment of fair compensation. (City of Los Angeles v. Los Angeles Gas & Elec. Corp., 251 U. S. 32, 39; see, also, Kimball Laundry Co. v. United States, 338 U. S. 1, 13, supra.) Thus, in each instance where one of claimants’ franchises was destroyed, an award must be made whether or not that franchise was the subject of a formal condemnation As we so recently declared in the Port Authority case, in making such awards, the question under consideration is ‘ ‘ what constitutes just compensation to the owner and operator of an essential public facility when its property is condemned for continued dedication to the same use to which the owner had dedicated the property.” (Matter of Port Auth. Trans-Hudson Corp. [Hudson Rapid Tubes Corp.], 20 N Y 2d 457, 466, supra; emphasis added.) Yet this very principle was ignored by the court below.
In the opinion of Special Term “ The City did not need to acquire these franchises in order to operate the buses over the routes theretofore used by claimants, since the City always had the right to do so.” The denial of any value for these franchises cannot be sustained, as such an “ award ” is in contravention of the established law of this State.
One final item was found to have no value — expenditures incurred in selecting and arranging the bus garages and shops. The court concluded that, since the allowance heretofore made for these garages and shops was computed on the basis of an operating system, no additional allowance was warranted. In the absence of any showing of error, we sustain this disallowance.
We now come to the claims for which an award was made — personnel and operating schedules. As we stated above, claimant employed nearly 6,000 persons at the time of condemnation. This large work force was divided into the following classifications : bus operators; maintenance workers; administrative staff; clerical employees and executive personnel. Awards were made for certain classes of employees, based on some evidence in the record. Since these awards were affirmed by the Appellate Division, we merely note that our jurisdiction precludes us from further scrutinizing them.
This limitation, of course, does not apply where no allowance was made for the employees. Thus, unsupported statements *627 that trained janitors, watchmen, car washers and cleaners, flagmen, firemen, building mechanics and register inspectors exist in New York City in such abundance that no award need be made for them are not binding on this court. We cannot agree that there is no expense involved in interviewing, selecting and training these members of the maintenance force. Equally illogical is the finding of no value for all the executive personnel based on the unsupported speculation that ‘ ‘ the hypothetical buyer would be able to. recruit such personnel at nominal expense, from other bus companies or other cities.” Mr. Roberts, testifying for the city at the first trial, said: ‘ ‘ The investment in the training of supervisors and executives runs into a large sum and an average of 6 months expires before the new occupant of any supervisory or executive position is fully qualified to stand on his own feet and make all the decisions and to perform all the acts for which his position calls.” Claimants are, therefore, entitled to an award for all their employees.
One category remains — operating schedules. Special Term concluded that these schedules were worth $240,000. As we have stated before, affirmed findings of fact, based on some evidence, will not be disturbed. Accordingly, we do not question this award.
At the conclusion of its opinion, the court below tested its total award by showing a percentage relationship between the award and the total value of the tangible assets. Citing several utility cases, the court contended that an award of 8.5% of these tangible assets for going concern was adequate and just. In the Port Authority case we stated that “ There is no basis or warrant in law for any such rule of thumb. ’ ’ (20 N Y 2d 457, 472.) We adhere to this position.
Were we to bind ourselves to such a mechanical jurisprudence, these utility rate cases would in any event be inapplicable. As the city’s expert testified, a proper rule (should one be employed) for bus companies would require an award for going concern of 20% of the tangible assets. In this case, that would be $6,070,708. Thus, by properly employing the verification test suggested by Special Term, it becomes apparent that an award of only $2,577,500 is indeed inadequate.
*628 In summary, we find that there is sufficient evidence to sustain the award made for claimants’ operating schedules. We also affirm that portion of the award for trained personnel which attributes actual value to certain classes of employees. We further conclude that the court below properly found that the garage and shop layouts were considered in evaluating the tangible assets. We reject those findings of the lower court which are at variance with the proof, and contrary to it—specifically, findings of no value for the coach routes; operating systems, procedures and records; franchises, operating rights and permits, and certain classes of trained personnel referred to above.
Accordingly, the order appealed from should be modified and the matter remitted to Special Term for further proceedings in accordance with this opinion, with costs.

. In Banner Milling, claimant operated a flour mill. The State did not appropriate this business, but merely sought the land and its appurtenances for a canal. That court itself served notice that its decision should have no applicability to the instant base. “ There is a marked distinction between the instances where the State appropriates a public service corporation and all its business and good will as a going concern intending to continue its operations as a public enterprise [citations omitted], and those instances where the State desires the land and not the business.” (240 N. Y. 533, 539-540.)

. This court has subsequently held that a condemnee is entitled to going concern value where the condemnor continues to operate a transit facility, although it is clear that the condemned facility is “inherently incapable” of operating at a profit. (Matter of Port Auth. Trans-Hudson Corp. [Hudson Rapid Tubes Corp.], 20 N Y 2d 457, cert. den. 390 U. S. 1002.)

. The trial court, reconsidering this case without the benefit of our recent decision in Matter of Port Auth. Trans-Hudson Corp. (Hudson Rapid Tubes Corp.) (20 N Y 2d 457), stated at one point in the opinion: “In order to determine value to the condemnees of the intangible assets enumerated above, ‘the usual formula is to determine what a willing buyer would pay to a willing seller in an arm’s-length transaction ’ ”. While recognizing that our remand specified that the award should be valued according to reproduction cost less depreciation, the court continued: “ The value to be fixed must be what a prudent buyer would spend on the date of condemnation to reproduce the intangible assets which he would find useful in continuing the business.” In the Port Authority case, the “ willing buyer ” rule was rejected, and the rule set forth in Fifth Avenue reaffirmed. (20 N Y 2d 457, 472.)
Were the “ willing buyer ” rule applicable to this case, it is nevertheless improper, even under this rule, to endow the “ hypothetical buyer ” with all the powers of a sovereign, as the court did when it valued claimants’ franchises.

. Mr. Schwartz, the city’s expert, testified to the conditions he observed in two garages, following a month-long strike.