292 So.2d 810 (1974)
Keith F. LANNEAU
v.
CAPITAL TRANSPORTATION CORPORATION.
No. 9732.
Court of Appeal of Louisiana, First Circuit.
March 18, 1974.
*812 Wallace A. Hunter, Baton Rouge, for appellant.
Andrew J. Bennett, Jr., Joseph F. Keogh, Parish Atty., Wendell G. Lindsay, Jr., Baton Rouge, for appellee.
Before LANDRY, ELLIS and PICKETT, JJ.
LANDRY, Judge.
Plaintiff (Lanneau), sole owner of the stock of Metro Transit Corporation (Metro), operator of a mass transit bus system in the City of Baton Rouge and its environs, appeals from a judgment fixing the value of Metro's tangible and intangible assets at $245,433.00 pursuant to a sale of Metro's capital stock to Capital Transport Corporation (CTC), a public corporate agency of the City-Parish Government of the City of Baton Rouge and Parish of East Baton Rouge. CTC has answered the appeal seeking expert witness fees disallowed below and an increase in the fee of one expert for whom a fee was allowed. We amend the judgment and award Lanneau an additional $10,608.00 for certain tangibles. We also amend the judgment and disallow all expert witness fees.
The basic res nova issue presented is the proper method of appraisal of assets of a mass public transportation system pursuant to a private sale from a private ownership to a nonprofit governmental agency. Three prime questions are posed. First, what is the proper method of determining value of "hard" or tangible assets? Second, does "going concern value", consisting of routes, systems, schedules, personnel, records and other intangibles, have value when such a system is privately sold when operating at a loss? Third, whether, pursuant to agreements between the parties, proof of valuations are limited to appraisals made by one appraiser appointed by the seller and one selected by purchaser?
RELEVANT BACKGROUND INFORMATION EITHER CONCEDED, STIPULATED OR ESTABLISHED BY THE RECORD
Prior to November, 1968, Baton Rouge Bus Company, which operated a public mass bus transportation system in and around the City of Baton Rouge, was owned and operated by American Transit Enterprise (ATE). Although the system was then operating at a profit, it was in a distress situation. ATE owned 36 buses, 31 of which were "Southern Coaches", no longer being manufactured, and for which parts were hard to acquire. These buses averaged approximately 12 to 14 years of age. The remainder of the fleet consisted of five GMCs of considerably more recent vintage. None of the buses were air conditioned. The system was beset by labor troubles and faced the possibility of a boycott. The prospect of a losing operation was imminent in that ATE had no reasonable expectation of a rate increase. At this juncture, Lanneau became interested in the system on behalf of a corporation known as Micro-Tek Engineering Corporation (Micro-Tek). Apparently, Lanneau initially intended to continue the operation. ATE asked $294,000.00 for the system. After negotiations, Micro-Tek agreed to purchase provided: (1) ATE secured an extension of its franchise which was about to expire; (2) ATE obtained a new three year union contract; (3) there appeared reasonable prospect of a rate increase, and (4) it appeared that reasonable opportunity existed for participation in the federal grant program known as the Urban Mass Transportation Act (UMTA), adopted by Congress in 1964.
The conditions being fulfilled to Lanneau's satisfaction, a meeting of Micro-Tek's Board of Directors was called to approve the transaction. It appeared, however, that due to the continuing threat of a boycott, the system would probably be shut *813 down before Micro-Tek could take over. Primarily for this reason, Micro-Tek declined to purchase. Lanneau then purchased the system for his own account for the purpose of eventually transferring same to Micro-Tek. On November 20, 1968, Lanneau personally purchased all of the stock from ATE for $120,000.00 Cash, and the alleged assumption of tax liabilities amounting to $141,000.00, the precise nature of which is never fully explained. It is conceded, however, that Lanneau has never been called upon to honor this commitment. It is also shown that Lanneau has since received a tax refund of $17,000.00, resulting from his purchase from ATE. Eventually Micro-Tek declined to purchase. Lanneau then formed Metro, of which he is admittedly sole owner, and to which he transferred all capital stock purchased from ATE. Earnings of the system declined annually from a net income of $64,764.00 in 1966, to a loss of $19,672.00 in 1969. Lanneau testified that he incurred losses of $70,000.00 from his acquisition in November, 1968, to August 21, 1970, the date of his sale to CTC, which losses he claims to have personally subsidized. To extricate himself from an adverse position, Lanneau sought to sell the system to the City-Parish Governing authority, who could seek aid to purchase new equipment under UMTA. After considerable negotiations, an option was entered into between Lanneau and the governing authority of the City of Baton Rouge (City) on December 10, 1969. The option granted the City the right to purchase either Metro's tangible assets alone, or both tangibles and intangibles, it being understood that in either event, the sale would be made through the sale of Metro's stock. The option also provided that the value of tangibles or tangibles and intangibles would be determined by means of appraisals by qualified Transit Engineers. In essence, the option provides that the City would have an appraisal made, which if not satisfactory to Metro, or which did not produce agreement, would be followed by an appraisal made on behalf of Metro. It further stipulated that, if no agreement could be reached after the second appraisal, the matter of value would be submitted to the courts "in an expropriation proceeding." In addition, the City was given the privilege of transferring its option to a nonprofit corporation created to maintain a public transportation facility for the City. In December, 1969, Metro was granted a fare increase of five cents raising its fares from 30¢ to 35¢, and allowed a transfer charge of 5¢, which latter rate was not to be enforced for months. In January, 1970, revenues increased, but declined steadily thereafter.
Lanneau's contention that the option contractually limits proof of value to the two appraisals mentioned impels our quotation of relevant Section 4 thereof which reads as follows:
"Section 4. The option and agreement herein granted to purchase, lease or otherwise acquire the tangible operating assets and the intangible operating assets of Metro Transit Corporation is granted with the understanding that the purchase price of the assets, both operating tangible and intangible properties of Metro Transit Corporation, shall be determined by means of appraisals by qualified Transit engineers. The City of Baton Rouge shall cause an appraisal to be made and in the event this appraisal is not satisfactory to Metro Transit Corporation or negotiations subsequent to this appraisal are not successful, then a second appraiser shall be selected and paid for by Metro Transit Corporation. In the event the two appraisals do not result in an agreement between the City of Baton Rouge and the Metro Transit Corporation, the parties shall by negotiation arrive at the consideration to be paid on both tangible and intangible operating assets for purchase, leasing or other method of acquisition of the same. If agreement cannot be reached as to purchase price, then the matter shall be submitted for determination to the courts in an expropriation proceeding. It is *814 stipulated and agreed by Metro Transit Corporation that in the event expropriation proceedings are filed, the court may enter an immediate judgment vesting title in and to all of the stock of the corporation owning the assets of Metro Transit Corporation in the expropriating authority provided that at the time of the filing of suit there is deposited in the registry of the court the amount of the just compensation as estimated by the expropriating authority, which sum shall be available for withdrawal by Metro Transit Corporation subject to payment of any mortgages, liens, taxes or other encumbrances affecting the title to the properties expropriated, and provided further that said withdrawal may be made by Metro Transit Corporation without prejudice to its right to claim additional just compensation in the expropriation proceeding, together with legal interest and costs on any additional amount which might be awarded. The City of Baton Rouge is empowered to transfer and assign its rights hereunder to a nonprofit corporation created for the purpose of providing for the maintaining of public transportation facilities and services for the City of Baton Rouge.
Subsequently the City created CTC, a nonprofit municipal corporate agency qualified to apply for an UMTA grant for the express purpose of acquiring Metro's stock and continuing the operation of the mass transit system for the benefit of the public.
The City apparently opted to purchase tangibles only and chose De Leuw, Cather & Company, whose Donald W. Cather (Cather) initially appraised Metro's tangible assets alone at the sum of $192,433.00, on May 12, 1970. This figure did not produce an agreement. Lanneau then appointed Simpson and Curtin, whose Fred W. Waterholter appraised Metro's tangible assets at $242,038.00, and intangibles at $202,850.00, or a total of $444,888.00. Sometime during negotations which followed the second appraisal, the City requested Cather to appraise Metro's intangibles. On June 29, 1970, via telephone, Cather gave the City an "estimate" of $53,000.00, which he considered the maximum that could be paid for the intangibles and still qualify the City to receive federal funds pursuant to UMTA. Negotiations continued on the basis of Cather's total appraisal or estimate of $245,433.00, and Waterholter's valuation of $444,888.00. During the negotiations, Lanneau threatened to cease operation because of his continuing losses. The matter was resolved in the form of an agreement dated August 21, 1970, entitled "SUPPLEMENTAL AGREEMENT TO SALE OF STOCK AGREEMENT", whereby CTC agreed to purchase Metro's tangibles and intangibles at the minimum price of Cather's $245,443.00 appraisal of all such items. The agreement recited that Cather's appraisal represented minimum value and Waterholter's appraisal represented maximum value. Lanneau bound himself not to seek an amount greater than Waterholter's valuation should he sue for further compensation. CTC agreed that in any action by Lanneau, Cather's appraisal would be deemed the minimum value recoverable. In pertinent part, the supplemental agreement read as follows:
"It is understood between the parties hereto that within one year from the date hereof, KEITH P. LANNEAU shall have the right to institute a legal demand against Capital Transportation Corporation in the Nineteenth Judicial District Court, Parish of East Baton Rouge, Louisiana, without jury, for a Judgment for an amount which he contends should have been a higher evaluation on the tangible and intangible assets of Metro Transit Corporation than the amount of $245,443.00 appraised by DeLeuw, Cather & Company and which was used as a base for the computation of the value of the stock of Metro Transit Corporation in the "Sale of Stock Agreement", entered into simultaneously *815 herewith, subject to the following restriction: . . . ."
While negotiating with Lanneau, the City and CTC simultaneously negotiated acquisition of eight small interurban bus routes involving school bus type vehicles owned principally by individuals, some of whom owned just one bus and acted as their own drivers. These systems involved a total of 11 buses and included one system with no vehicles, only a franchise. In late July and early August, 1970, CTC acquired all eight operations, paying a total of $10,003.75 for tangible assets and $63,903.60 for intangibles. After acquisition of Metro's stock, CTC merged the Metro system and the various interurban routes into one system and continued operation without interruption of service.
Within the allotted contract term, Lanneau sued to recover as compensation the amount of Waterholter's appraisal.
THE ISSUES ARISING UPON TRIAL
Relying on the option and sale, plaintiff-appellant sought below to restrict evidence of value to the appraisals rendered by Cather and Waterholter. Appellant successfully maintained the agreements were the law between the parties, and that all the trial court could do was reach a valuation based upon the two appraisals. To establish values, CTC produced Cather as an expert, and also sought to introduce testimony of certain other experts including Fred A. Lucas and Francis Collins, who valued the tangible assets only. These additional witnesses found no value for the intangibles. Appellant objected to the testimony of all witnesses other than Cather. In essence, the trial court sustained Appellant's objection but admitted the disputed evidence under a proffer of proof. The lower court rendered judgment fixing the value of the stock at Cather's total evaluation of $245,443.00. In substance, the court ruled that, since the enterprise was a losing concern at the time of sale, the intangibles, consisting of going concern value, were worth little, if anything at all. On this bases, the lower court concluded that all differences between Cather's and Waterholter's appraisals of tangibles, including $4,953.00 in office furniture conveyed but not included in Cather's appraisal, and the value of two lifts totaling $5,655.00, which Cather discounted for reasons subsequently shown, were more than compensated for by the additional $53,000.00 paid for intangibles pursuant to Cather's estimate of intangibles.
Appellant contends the trial court erred in: (1) Relying on the rejected testimony of Lucas, Collins and other witnesses in reaching its conclusions; (2) failing to give effect to the written agreements which limited proof of value to Cather's and Waterholter's appraisals and testimony; (3) failing to fix value on Waterholter's appraisals of both tangibles and intangibles; (4) failing to award recovery for $4,953.00 worth of office furniture and fixtures actually conveyed but omitted from Cather's appraisal; (5) failure to award $24,967.00 for certain tangibles included in Waterholter's appraisal but omitted from Cather's appraisal as having no value; (6) failing to make an award for intangibles such as routes, schedules, systems, trained personnel, including drivers, mechanics, supervisory and office personnel, records and other intangibles of value to a going concern; (7) rejecting Waterholter's appraisal of intangibles which was the only appraisal of such items in the record, and stood unrebutted by admissible evidence inasmuch as Cather made only an "estimate", not an appraisal of intangibles, and (8) fixing fees of experts despite their failure to appear for cross-examination on trial of the rule to fix costs.
ADMISSIBILITY OF TESTIMONY OF WITNESSES OTHER THAN CATHER AND WATERHOLTER
The option provided that the right to purchase was granted in consideration of the sum of $20,000.00 Cash, paid at the time. It also provided for extension for a *816 number of months at an additional consideration of $5,000.00 per month. It is conceded that the option was extended for one month for which the City paid $5,000.00, and that the sum of $25,000.00 thus paid was to be credited to the purchase price. The subsequent sale acknowledges prior payment of $25,000.00 of the purchase price, and purchaser is given credit therefor, as provided in the option.
CTC contended that, upon confection of the sale, the option was no longer a viable agreement, and that the terms of the option are not to be considered in construing the sale. Lanneau, however, argues that both documents must be considered together in arriving at the intent of the parties. Relying upon rules of interpretation contained in LSA-C.C. arts. 1901, 1945, 1949 and 1963, Lanneau contends the two documents evidence intent to limit proof of value to the appraisals called for in the option. While we agree that the documents must be considered together in determining the intent of the parties, we disagree with the trial court's conclusion that the parties intended to limit proof of value to the appraisals and testimony of Cather and Waterholter.
Legal agreements have the effect of law on the parties involved; this being so, courts are bound to give legal effect to contracts according to the true intent of the parties, which is determined by the words of the contract when these are clear and explicit and do not lead to absurd consequences. LSA-C.C. art. 1945; Guy L. Deano, Inc. v. Michel, 191 La. 233, 185 So. 9. Even when the terms of a contract are fairly explicit, it is the duty of the court to refrain from construing them in such manner as to lead to absurd or unreasonable consequences. Crow v. Monsell, La.App., 200 So.2d 700.
Construing the documents together, we find no evidence of intent to limit testimony in an action instituted by Lanneau to recover additional compensation solely to the testimony of Cather and Waterholter. We view the documents as providing in effect a method of obtaining a possible mutual agreement as to price based on the two appraisals, failing which, the matter would be resolved by litigation should the seller elect to seek compensation over and above the agreed minimum stipulated in the sale.
Although the parties concede this is not an expropriation proceeding to condemn property for a public purpose, but rather a suit on a contract, to some extent, both litigants approached the matter as though it were an expropriation proceeding. Considerable argument is advanced by the CTC in support of the proposition that tangibles should be paid for on the basis of market value. We reject this position for reasons hereinafter set forth.
In the absence of clear and unmistakable language unequivocally expressing such intent, we are most reluctant to interpret subject contract to mean proof of value was limited and restricted to the two appraisals mentioned in the option. We believe that if such had been intended, the parties would have clearly so stated in unmistakable terms. We cannot infer or assume that either party would agree to such a restriction upon the nature and extent of his proof of value in the event of litigation over a matter of this nature. We find that there was no intent to limit proof of value as held by the trial court, and that the testimony of the additional witnesses offered by CTC was admissible for the purpose of determining value.
THE DISPUTE OVER VALUATION OF TANGIBLES
Appellant contends that, although the two appraisals show a difference of $49,595.00 in valuation of tangibles, the actual difference is $35,575.00, which appellant is entitled to recover. Appellant notes that Cather appraised the revenue producing units (36 buses) at $135,100.00. In so doing, he used reproduction cost new, less depreciation, adjusted to present condition, *817 taking into consideration market conditions, remaining useful life, engine condition and general maintenance of the fleet. He determined reproduction cost new by obtaining quotes from manufacturers for reproduction of like buses.
Waterholter, using substantially the same method, except that he obtained quotes for comparable buses, appraised the revenue producing units at $145,480.00. The difference of $10,380.00 in value of buses resulted mainly from Cather's downgrading of the Southern Coaches 30% in each instance because of their high maintenance cost and the difficulty of obtaining replacement parts for these units. Lanneau says the trial court erred in accepting Cather's valuations inasmuch as the Southern Coaches were in use.
Appellant shows that furniture valued by Waterholter at $5,921.00, and not appraised by Cather, was transferred in the sale. It is conceded that three items in this category, valued at $968.00, were not conveyed, thus resulting in a net difference of $4,953.00. It is acknowledged that Cather was instructed not to include office furniture and fixtures in his appraisal.
Shop and garage equipment transferred included two Weaver Hydraulic Lifts permanently installed in a rented building used by Metro as a machine and/or repair shop. Cather did not include these items in his appraisal, being of the view that they were part of the rented building and would have to be left behind when the lease expired. Waterholter appraised these units at a total of $5,655.00, and included this figure in his appraisal of shop and garage equipment in the sum of $21,237.00. Without including the lifts, Cather appraised shop and garage equipment for $14,000.00, a difference of $7,237.00 on this category of tangibles.
Fare collection equipment (fare boxes consisting of 37 Johnson D Boxes) were appraised by Waterholter at $6,290.00. He arrived at this figure by depreciating their $20,535.00 cost new down to 30% thereof. Cather appraised these units at $90.00 each, or $3,400.00, a difference of $2,890.00. Metro contends Cather did not appraise these items but arbitrarily assigned a $90.00 per unit value. Metro argues that, in fixing values on these units, the trial court relied to some extent on the testimony of Lambert which the court rejected.
Included in the transfer were components characterized as spare units consisting of four engines, six transmission and one differential assembly, most designed for use in the Southern Coaches. Using reproduction cost new, less depreciation, Waterholter appraised these units at $16,350.00. Employing his engineering judgment after inspecting these units, Cather appraised these items at a total of $7,400.00, a difference of $8,950.00.
Also included were four vehicles characterized as service vehicles, consisting of two passenger cars and two pickup trucks, one of the latter two automobiles being equipped with a winch converted it into a tow car. Cather appraised all four vehicles at $1,850.00, Waterholter at $3,015.00, a difference of $1,165.00.
Appellant suggests that the above distinctions leaves a remaining difference in appraisals of $15,400.00, of which amount $11,537.00 is admittedly not due because it represents a difference in current assets which were to be finally determined on transfer date. In this connection, it is shown that materials and supplies (fuel, grease, lubricating oil, etc.) were appraised by Waterholter at $42,230.00 and by Cather at $30,693.00, but due to daily changes in these materials, the sum of $38,101.00 was actually paid therefor on the closing date of the sale. This difference of $35,575.00 is sought as additional value of the tangible assets. Alternatively, appellant seeks the value of the furniture actually conveyed, $4,953.00, and the value of the two Weaver hoists, $5,655.00, a total of $10,608.00.
Donald W. Cather, Vice President of De Leuw, Cather and Company consulting engineers *818 specializing in public transportation systems, testified he holds degrees in Business Administration and Civil Engineering. He is a member of numerous professional societies and has made many appraisals of public transportation systems. He first came to Baton Rouge in April, 1970, at the request of the City. He appraised Metro's tangibles only, and also appraised about 13 school bus type vehicles used by interurban operators in the north part of the municipality. He was instructed to appraise at maximum value for tangibles on the assumption the operation would continue without interruption and using the same labor force. He explained that the original estimate was given for tangibles only since UMTA does not permit grants to purchase going concern value, but only in aid of acquisition of physical assets. He also stated that the bus industry is a declining one in that fares are increasing, riders declining and operating costs on the rise. Keeping these factors in mind, he attempted to arrive at a fair value of tangibles because he felt the then owner was either going out of business voluntarily or was being forced by circumstances to cease operations. He also stated that, in the majority of cases, the new owner takes over with the view of junking from 30 to 50% of the equipment purchased and replacing same with new equipment purchased with UMTA money.
He divided tangibles into categories denominated revenue vehicles (buses), materials and supplies, spare units (replacement engines, transmissions, etc.), fare boxes, service vehicles and shop and garage equipment. He did not value office furniture and fixtures because he was instructed by the City not to do so. He valued the buses (revenue equipment) at market value, which was determined by taking reproduction cost new less depreciation adjusted on the basis of present condition considering wear and tear, general appearance, climatic conditions and comparison with other vehicles of similar age. He noted that buses depreciate less in the first few years of operation, and more rapidly in later years. Cather found the 31 Southern Coaches ranged in age from 13 to 17 years, and the mileage on these units ranged from 308,000 to 682,000 miles. He considered 600,000 miles the useful life of a bus. He found that four Southern buses had no useful mileage remaining, and ten had no remaining useful life. He noted that the Southern buses were no longer in manufacture, that they used imported engines, and that spare parts for these units were hard, if not impossible, to obtain. He found that the five GMC buses were of much better quality and had about one-third remaining useful life. He also considered fuel consumption records. In valuing the Southern Coaches, he consulted recognized trade magazines editions from 1966 to the date of his appraisal, and observed that they contained no ads to either buy or sell Southern Coaches. He appraised the GMC units at $70,000.00, and the Southern Coaches at $65,100.00, or a total of $135,100.00. Cather noted that top fleet operators strive to maintain an average 7 to 8 years age on buses by periodically buying a few new buses and selling or trading off their old ones. In this manner, they never have too many old or new buses on inventory. He also noted that while Metro's fuel and oil consumption records were excellent, its maintenance records were relatively poor. He stated that the average age of Metro's buses was approximately twice that of the 7½ year average sought to be maintained by a prudent operator. He also noted that approximately 30 of Metro's buses needed replacement.
In his valuation of fare boxes, Cather relied on the current market prices quoted him by sellers of these units. Finding that these boxes could be purchased for $90.00 each, he used this figure in his appraisal.
Cather conceded he used his engineering judgment in appraising the spare units (engines, transmissions and differential assembly). He did not attempt to determine either the purchase price of these units or their reproduction cost new. He found *819 that most of these units were for the Southern Coaches which had either reached or were nearing the end of their useful lives. He also found the number of units was excessive for the size of the fleet and deemed it unwise for a purchaser to buy equipment not needed. Bearing all these factors in mind, he appraised all units at a total of $7,400.00.
Four service vehicles, consisting of two passenger cars, a 1965 Chevrolet and a 1961 Ford, and two one-half ton pickup trucks, a 1959 Chevrolet and a 1953 Ford (the latter equipped with a winch), were appraised by Cather for a total of $1,850.00. Of this amount, he attributed $1,000.00 to the Ford pickup which he considered a wrecker or tow car. Cather admits he valued these vehicles by checking newspaper advertisements for the sale of similar vehicles and using his judgment as to the value of the winch truck.
Cather appraised the shop and garage equipment, consisting of motors, compressors, tools grinders, jacks, drill presses, grease guns, hand tools and other similar tools and equipment at $14,000.00, based on Metro's book value of $19,000.00, and his own engineering judgment.
On April 31, 1970, Cather found $30,693.00 in Metro's inventory of materials and supplies including fuel, lubricating oil, greases and other such elements. He did not appraise these items inasmuch as the inventory changed daily, and it was contemplated that a final inventory be taken on the date of transfer.
Using the same categories as Cather, Waterholter appraised the revenue equipment (buses) at a total of $145,480.00. The difference between Waterholter and Cather's appraisals is largely accounted for on the ground that Waterholter considered the Southern buses to have longer remaining mileage and service potential. For this reason, he valued the Southern Coaches somewhat higher than Cather. In arriving at his valuations, he used substantially the same method, namely, reproduction cost new, less depreciation, taking into consideration the present condition of each vehicle. Waterholter valued the 37 Johnson D fare boxes found on hand by determining their reproduction cost new to be $20,535.00. Based on an estimated 30% remaining life, he valued these items at $6,290.00 in March, 1970.
The spare parts, consisting of four engines, six transmissions and one differential, were valued by Waterholter at $16,350.00, based on his ascertaining their reproduction cost new to be $31,599.00.
Using Redbook value to some extent, Waterholter appraised the four service vehicles, two passenger cars and two pickup trucks, at a total of $3,015.00.
Waterholter appraised shop and garage equipment, consisting of tools, drill press, work bench, grinder, jacks, etc. at $21,237.00, based on a valuation new in the amount of $37,623.00. Office furniture and fixtures were appraised by Waterholter at $5,921.00 predicated on reproduction cost new of $9,912.00.
Under materials and supplies, Waterholter listed two major categories with several subdivisions. Under "Controlled Stores", he listed 10 classifications of parts having a reproduction cost new of $31,959.55, which he valued at that same amount. Of these ten classes, four consisted of engine parts for Southern Coaches valued in excess of $20,000.00. In addition to "Controlled Stores", Waterholter valued parts consisting of wheels, a crankshaft, 6 cylinder heads, 3 starters, 2 batteries, 2 blowers, and 1 alternator, at $4,456.00, predicated on a cost new of $6,770.00. To these items, he added $4,255.00 or 10.5% of their cost new, as a handling charge which he depreciated to $4,014.00. In this manner, he reached a total valuation of $42,230.00 for all categories of materials and supplies. Waterholter explained that, in his opinion, it cost 10.5% of cost to purchase, stock, catalogue and handle items of this nature.
Appellant attacks Cather's appraisal of tangibles on numerous grounds. It is contended *820 that, as to the buses, Cather failed to consider that these units were part of a going concern, that they were not purchased for resale, and that even the Southern buses had considerable useful life remaining. Appellant also points to Cather's omission to appraise the office furniture. In addition, appellant argues that Cather erroneously found the two Weaver lifts were without value on the mistaken belief these items became part of the realty to which they were attached. In this regard, it is pointed out that Appellant was required to assign his lease of the building to CTC, therefore, the purchaser had the use of these items at least until the lease terminated. Appellant also contends that Cather erroneously concluded the spare parts (engines, etc.) were worth only $7,400.00, and further erred in appraising shop and garage equipment, tools and other similar items at far less than Waterholter on the premise that the parts were either obsolete or unnecessary. It is also argued that Cather improperly appraised these items on the basis of his engineering judgment rather than on the basis of reproduction cost new, less depreciation as did Waterholter.
CTC called as its witness, Fred Lucas, Vice President, Hausman Bus Company, Chicago, Illinois, whose concern is the only one in the nation engaged solely in the business of buying and selling buses. Lucas travels extensively in the course of buying and selling buses. On August 20, 1970, he appraised Metro's buses. He appraised the five GMCs at $7,500.00 each. He stated he would have purchased ten or eleven Southern buses at $250.00 each, but would not have bought any at all unless he could purchase the five GMCs. He stated that five additional buses with Fabwell engines had no value because parts for these motors are impossible to attain. He confirmed that parts for Southern Coaches are hard to find. When advised that his company appraised Metro's fleet in 1968, at Lanneau's request, and then appraised the Southern buses at $1,160.00 each, he explained that the former appraisal was obviously given in contemplation of Lanneau purchasing the entire fleet and buying a going concern. He also explained that his appraisal at trial was based on what his company would pay for the buses for purposes of resale without any going concern value.
Donald Lambert of National City Management Corporation, Houston, Texas, whose concern manages mass transportation systems, and also buys and sells buses, was called by CTC. In December, 1970, Lambert's firm was hired to manage CTC's Baton Rouge operation. He believes that in valuing buses and tangible assets of transit companies, the proper criteria is reproduction cost new, less depreciation, taking into consideration the then existing condition of the equipment, and also considering actual life used, remaining useful life, and maintenance history. He explained that straight line depreciation did not reflect true current value because by that method, a 10 year old vehicle with a 10 year useful life would be worth zero despite its being still in useful service. He found Metro's maintenance records deficient. He would have purchased only four of the Southern buses for spare parts. Knowing what he did about the system, he opined that in January, 1970, he could have negotiated a sale with Lanneau for all of Metro's assets for $165,000.00. Lambert valued the five GMC coaches at $9,000.00 each, or $45,000.00, and the remainder at a total of $54,000.00, or $99,000.00 for the entire fleet. He noted that buses on which Waterholter placed a reproduction cost new of $34,000.00, without air conditioning that cost about $5,000.00 extra, could be replaced by improved, air conditioned counterparts for $32,000.00 each. Lambert appraised spare parts at $15,000.00 because they were of particular value to this particular fleet. He valued the '65 Chevrolet passenger car at $750.00; the '61 Ford passenger vehicle at $200.00; the Chevrolet truck at $1,500.00, and the Ford pickup truck at $1,800.00. The shop and garage equipment he appraised at $17,900.00; the *821 office furniture and fixtures at $4,000.00; the fare boxes at $40.00 each, or $1,400.00, and materials and supplies, $25,000.00, a total of $165,200.00, for all of Metro's tangible assets he would consider purchasing.
Francis A. Collins, Certified Public Accountant, testified that he prepared a balancing of assets statement as of the date of sale, pursuant to the terms of the transfer. His calculations resulted in an adjusted figure of $30,333.00 which was paid in cash.
Cather, Waterholter and Lambert all stated in effect that reproduction cost new, less depreciation, taking into consideration the present condition of equipment, including age, maintenance and other pertinent factors, is the generally accepted method of valuing the tangible assets of a mass transportation company. All conceded, in substance, that, in final analysis, they compare the valuations thus reached with the market value of similar equipment and materials, but only for the purpose of checking the accuracy of their results. None relies upon market value as the criterion of value. They explained that, in sales of this nature, it is quite common for the vendor and purchaser to agree to terms which are either contained in written collateral agreements never made public, or ancillary verbal agreements which suit their respective purposes. For these reasons, as well as for considerations peculiar to each locality, neither appraiser relies to any great extent upon comparable sales of systems in making appraisals of this nature.
CTC urges our adoption of the market value rule applied in expropriation cases as the measure of value in this instance. In view of the testimony of the experts, we find that the market value approach would not do justice to either purchaser or seller in instances of this nature. The record is clear that cases of this nature fall into a highly specialized category where, because of the considerations above noted, sales of comparable systems do not necessarily provide a reasonably accurate measure of value. We find that the basic reproduction cost new, less depreciation, primarily relied upon by all of the appraisers herein, is more likely to provide a realistic measure of value in the sale of a mass transit system.
Appellant contends that with certain items such as spare parts, service vehicles, and shop and garage equipment, Cather did not use reproduction cost new, less depreciation, as the measure of value, but rather relied upon his engineering judgment (as regards spare parts and shop and garage equipment), and newspaper ads (as regards the service vehicles) in valuing these assets, therefore, his valuations of these items should be disregarded. We note that, in each instance, Cather personally inspected the items and gave what we consider cogent reasons for his appraisals.
We find that Cather's appraisal represents a fair valuation of the assets he rated. It is considerably higher than Lambert's appraisal of $165,000.00. Eliminating the office furniture and Weaver hoists, which Cather did not appraise, his appraisal exceeds Lambert's appraisal by approximately the same amount in which Cather's appraisal is exceeded by Waterholter's appraisal of tangibles.
We find, however, that the trial court erred in rejecting Lanneau's claim of $10,608.00 for the office furniture and hoists which Cather did not appraise. The contract clearly provides that Cather's appraisals represent the minimum amounts due for tangibles and intangibles. Irrespective of the value of either classification, CTC is bound by these valuations inasmuch as the contract is the law between the parties. Since CTC received tangibles in excess of those valued by Cather, Lanneau is entitled to the value thereof. We amend the judgment accordingly.

THE INTANGIBLES
Appellant claims the trial court erroneously rejected his claim for intangibles *822 known as "going concern value", and appraised by Waterholter at $202,850.00. Going concern value is agreed by the experts to be the value to a new owner, whether purchaser or expropriator, of operating routes, schedules, systems of procedure, maintenance records, personnel records, trained drivers, mechanics, office staff and supervisory personnel, franchise rights and service contracts which enable an immediate takeover without interruption of service and consequent loss of patronage.
Relying primarily upon the series of New York cases entitled In re Fifth Avenue Coach Lines, Inc., particularly In re Fifth Avenue Coach Lines, Inc., 18 N.Y.2d 212, 273 N.Y.S.2d 52, 219 N.E.2d 410; In re Fifth Avenue Coach Lines, Inc., 22 N. Y.2d 613, 294 N.Y.S.2d 502, 241 N.E.2d 717, and In re Fifth Avenue Coach Lines, Inc., 34 A.D.2d 930, 312 N.Y.S.2d 592, together with In The Matter of the Port Authority Trans-Hudson Corporation, 20 N. Y.2d 457, 285 N.Y.S.2d 24, 231 N.E.2d 734, and The Metropolitan Transit Authority v. Baltimore Transit Company, Memorandum Opinion of the Superior Court of Baltimore City, Docket 1970, Folio 894, Case Number 123812, February 8, 1971, appellant maintains that going concern value is an intangible asset for which an owner is entitled to compensation in a matter of this nature, even where the system sold is operating at a loss.
All of the cited authorities deal with condemnation of mass transit systems pursuant to state laws authorizing expropriation of such facilities by governmental agencies and the operation thereof for the public benefit. In essence, these cases apply general expropriation law to the effect that where such properties are condemned, the expropriating authority must pay just compensation for the property taken. They also recognize that, as a general rule, going concern value, that is, the value of routes, schedules, trained personnel, organization costs, records and systems of procedure, which enable the expropriating authority to continue operation without interruption, have no value where the system is losing money and is inherently incapable of profitable operation because of either circumstances beyond the control of its management or inefficient management. In re Fifth Avenue Coach Lines, Inc., 18 N.Y.2d 212, 273 N.Y.S.2d 52, 219 N.E.2d 410, the highest court of New York made an award for going concern value although the system was operating at a loss due to the expropriator's suppression of rates which prevented the owner from operating profitably. Based on a finding that the record disclosed owner's ability to operate profitably under reasonable rates, the court in effect applied equitable principles and held it would not let the expropriator take advantage of the owner's dilemma which the expropriator created.
In Port Authority, above, the highest court of New York allowed going concern value, or more than mere scrap value, for a multimillion dollar tunnel constituting part of a transit system serving New York and New Jersey, in an expropriation proceeding, despite the venture was operating at a loss. The court therein reasoned that the expropriator would continue use of the tunnel, which formed a most important part of the system, and that its reproduction cost would exceed by many times the amount invested therein by the owner. Because of the unusual nature of the asset and its continued use, a substantial award was made therefor.
Metropolitan Transit Authority, above, involved the mass transportation system operated in Baltimore, Maryland, to a governmental agency possessing expropriating authority. A transfer was arranged by agreement, and a dispute over evaluations, including going concern value, arose. Our reading of the decision discloses that it does not reach a finding on whether or not the system was operating profitably. Be that as it may, the opinion did make awards for going concern value.
*823 So far as we are aware, the cited authorities are the sole instances in which going concern value has been allowed as an element of recovery in a case of this nature where the system involved was not operating at a profit. It is worthy of note that in N.Y., N.H. & H.R. Co., Bond Holders' Committee v. United States, 289 F.Supp. 418, the United States District Court for the Southern District of New York declined to follow Port Authority, above. This decision characterized as dicta the language in Port Authority which held that going concern value was a compensable asset even where the transit system taken was losing money. The Federal District Court declined to follow or apply Port Authority, above, and expressed considerable doubt that Port Authority would be followed in any instance in which the condemnee lacked such compelling equities.
Waterholter appraised eleven regular city routes at $1,300.00 each, and six special routes (including one planned route) at $600.00 each, or a total of $17,900.00. In addition, he deemed development cost of these routes to be $12,300.00, resulting in a total route valuation of $30,200.00. Operating schedules, including days and hours of operation and time tables to provide best service, Waterholter appraised at $12,000.00. Operating systems, procedures and records, Waterholter valued at $11,550.00, consisting of maintenance records at $75.00 for each of 36 buses, or $2,700.00; accounting system, $5,700.00, and personnel records at $50.00 for each of 63 employees, or $3,150.00. The most significant intangible was considered by Waterholter to be trained personnel. He determined the value of each of 40 trained drivers to be $1,088.00. Discounting this figure to allow for each driver's age and average work life, he determined the value of trained drivers to be $20,892.00. Under maintenance personnel, he valued employees from janitors to mechanics, using values ranging from $162.00 for the lowest class (Janitors) to $2,806.00 for two Class A Mechanics. Using the same discount method applied to drivers, he determined a value of $13,430.00 for maintenance personnel. Employing virtually the same method, he valued administrative and clerical staff at $30,080.00. Service contracts, such as agreements to purchase or lease tires, parts and accessories, were valued by Waterholter at $1,200.00. He considered industrial relations programs (Union contracts, employee and public relations) to be worth $28,500.00. Finally, he deemed operating rights (Franchise) to be valued at $55,000.00, as reflected on the books primarily due to Lanneau's recent acquisition of an extended franchise.
Cather testified that when asked in June, 1970, to give an estimate of the going concern value of the system, he was of the view there was no going concern value because of the condition of the company, and the fact that it was faced with imminent collapse. He stated, in effect, that he was pressed to give a going concern appraisal and reached a figure of $53,000.00, based on the franchise value carried on the books. Using this figure as a guide, he exercised his best judgment and arrived at a value of $53,000.00 for intangibles, which he deemed the maximum he could allow. He explained that he attempted to reach a figure that would satisfy UMTA officials' that the City had not forced the owners to sell under threat of a shut down because such action would have jeopardized the chances of the City subsequently obtaining UMTA funds. He was equally motivated by the need to continue uninterrupted service to the public. Cather was of the view that had the City not purchased the system, Lanneau would have been forced to close down within a comparatively short time because there was no possibility of any other sale. In effect, Cather was of the opinion that all the system was worth was what its components would bring on the open market. He conceded he did not appraise the intangibles, but merely gave an estimate of what he considered the absolute maximum that could be allowed therefor under the circumstances.
*824 Cather explained his appraisal of the intangible assets of eight interurban systems purchased by CTC at several times the value of tangibles by noting that these were special cases involving individual owners of small bus routes operating school bus type vehicles.
Lambert testified the only intangibles of any value were maintenance records on buses which he valued at $100.00 each, and personnel records which he appraised at $50.00 per employee, a total of $6,750.00 for all such records. He considers going concern value of no worth where the transit system sold is currently operating at a loss. As regards a profitably operating system, he would ordinarily consider going concern value to be approximately 2% of tangibles. He recounted at least two instances in which his concern negotiated for the purchase of systems involving considerable tangibles without paying anything whatsoever for going concern value where operation was marginal. In essence, he stated that in case of a marginal operation, or one operating at a loss, the owner is in no position to negotiate or bargain because he is faced with the alternative of taking what he can get from a prospective operator (if one can be found) or closing down and selling his equipment wherever he can and for whatever it will bring from other systems which may have need therefor. Lambert also testified that he negotiated for a twenty bus system formerly operated in Palm Beach, Florida. He stated that the system was shut down when purchased. At a cost of $14,000.00 (including his concern's fee of over $5,000.00), the system was reactivated within a month without purchasing any of the former operator's intangibles. He also stated that given reasonable notice, he could easily have maintained uninterrupted service without having the benefit of Metro's schedules, routes and other intangibles.
Lanneau conceded that when he acquired the system, it was still making a profit, but was "heading downhill". He also acknowledged that during his ownership, the system lost at least $70,000.00, which amount he subsidized from his own as well as company funds. He stated that the December, 1969 operation was profitable due to the granted rate increase, but the following month resulted in a loss, and losses continued thereafter. Lanneau admitted the system was ruining him financially, and that he seriously considered a shutdown to avoid further losses. He also stated that when he purchased the system, he paid nothing for going concern value because he was the buyer not the seller. He explained that, at that time, the owner was faced with an expiring union contract which he subsequently renegotiated. He conceded the City was his only hope for a sale.
It is clear from the record that the City did everything in its power to aid Lanneau during his ownership of the system. It appears the City was anxious for a private operator to succeed with the system as the City did not desire to assume responsibility for operation of a mass transportation system. It is equally clear that the City ultimately decided to purchase the system solely for the purpose of preventing a cessation of service, and the consequent inconvenience to the general public.
We find that this record furnishes unmistakable proof of the wisdom of the rule that, absent the most compelling circumstances or equitable considerations, going concern value, as hereinabove explained, has little or no worth to the purchaser of a mass transportation system which is a losing concern and is shown to be inherently incapable of profitable operation due either to inefficient management or general economic and other relevant conditions in the community in which the system is located. The record contains no evidence of mismanagement. It does, however, conclusively show, that due to general conditions in the Baton Rouge area, there was no reasonable prospect of profitable operation within the foreseeable future.
Considerable effort was made by the opposing parties, both at trial, in brief and in *825 oral argument, to discount the intangible values reached by their opponent's experts. CTC noted instances in which Waterholter's firm had expressed the view that intangibles are of questionable value, and are generally appraised at from 5 to 10% of tangibles, but never more than 40%. On the other hand, Lanneau points to the evaluation by Cather's firm of the eight interurban systems purchased by the City in which the value of intangibles exceeded that of tangibles by as much as ten times.
We are of the view that where intangibles are found to be of some value, it would indeed be most difficult to establish any rule of thumb by which they may be appraised. It is our judgment that the only logical rule in this respect is that each particular instance of this highly specialized nature must be decided in the light of its own circumstances.
Inasmuch as the system in question was admittedly in a state of steady decline for some time prior to the transfer; that it was operating at a loss, and that its owner was seriously considering cessation of operation to avoid financial ruin, we deem the minimum going concern value of $53,000.00 specified in the contract, amply compensates owner in this regard.

EXPERT WITNESS FEES
Considering Appellant Lanneau has successfully prosecuted this appeal and obtained an increase in the award of the trial court, we have elected to cast CTC with the costs of these proceedings insofar as is permitted by law. Inasmuch as CTC cannot recover expert witnesses' fees herein, it must perforce pay such fees and expenses as they have contracted for, and are not entitled to recover any portion thereof as costs. This determination renders it unnecessary to fix the fees of the experts as requested by CTC.
It is ordered, adjudged and decreed that the judgment of the trial court be amended to increase the award to plaintiff Lanneau from $245,033.00 to $256,041.00.
It is further ordered, adjudged and decreed that the judgment of the trial court fixing the expert witness fee and expenses of the witness, Donald W. Cather, in the sums of $1,500.00 and $500.00, respectively, and taxing same as costs, be and the same is hereby reversed and set aside, and in all other respects, the judgment of the trial court regarding expert witness fees be affirmed.
It is further ordered, adjudged and decreed that, to the extent permitted by law, costs of these proceedings shall be assessed against Capital Transport Corporation.
Amended and affirmed.